## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

SPEECH FIRST, INC.,

                           Plaintiff,

v.

WENDY WINTERSTEEN, in her official capacity
as President of Iowa State University of Science and
Technology; MARTINO HARMON, in his official
capacity as Senior Vice President for Student Affairs;
VERNON HURTE, in his official capacity as Dean
of Students; SARA KELLOGG, in her official
capacity as Assistant Dean of Students and Director
of the Office of Student Conduct; DAWN
BRATSCH-PRINCE, in her official capacity as
Associate Provost; MARGO FOREMAN, in her
official capacity as Assistant Vice President for
Diversity and Inclusion and Equal Opportunity;
ANDREA LITTLE, in her official capacity as
Manager of Employee and Labor Relations;
JAZZMINE BROOKS in her official capacity as
Equity and Inclusion Coordinator; KENYATTA
SHAMBURGER, in his official capacity as Assistant
Dean of Students and Director of Multicultural
Student Affairs; PETE ENGLIN, in his official
capacity as Assistant Vice President for Student
Affairs and Director of Residence Life; VIRGINIA
SPEIGHT, in her official capacity as Associate
Director of Residence Life; REGINALD
STEWART, in his official capacity as Vice President
for Diversity and Inclusion; MICHAEL NORTON,
in his official capacity as University Counsel;
MICHAEL NEWTON, in his official capacity as
Assistant Vice President and Chief of the Iowa State
University Police Department; AARON
DELASHMUTT, in his official Capacity as Assistant
Chief of Iowa State University Police Department;
MICHAEL RICHARDS, PATTY COWNIE,
DAVID BARKER, SHERRY BATES, NANCY
BOETTGER, MILT DAKOVICH, NANCY
DUNKEL, ZACK LEIST, JIM LINDENMAYER,
all in their official capacities as members of the State
Board of Regents,

                           Defendants.

**COMPLAINT**

Civil Action No. _____

Plaintiff, Speech First, Inc., brings this action under the First and Fourteenth Amendments to the United States Constitution against Defendants for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. "The mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979).

2. Yet Iowa State University and its officials have created a series of rules and regulations designed to restrain, deter, suppress, and punish speech concerning political and social issues of public concern. And they do so despite Iowa's central role as the "first in the nation" to weigh in on presidential primary elections. The University's policies plainly violate the First Amendment.

3. First, the University prohibits students from "chalking"—*i.e.*, writing messages on campus sidewalks with chalk. This chalking policy was instituted to quell "offensive" and political speech. And it allows only registered student organizations to advertise events to the exclusion of all other students, in violation of both the First Amendment and Iowa's campus free-speech law. Under the University's policy, students who "chalk" an unauthorized message face discipline.

4. Second, the University's Acceptable Use of Information Technology Resources Policy prohibits students from using email to communicate about campaigns and ballot issues. This content-based prohibition on core protected speech is backed by the threat of formal discipline.

5. Third, the University employs a Campus Climate Reporting System ("CCRS"), a team of University administrators who respond to "bias incidents" and refer them to the University's "administrative unit partners" for investigations. "[R]eflect[ing] a similar motivation as hate crimes,"

bias incidents include speech (on and off campus) that someone perceives as "demeaning," "taunting," "bullying," "verbal harassment," or "intimidation." Students accused of engaging in "bias incidents" risk referral to University officials for investigation and discipline. Yet the definition of "bias incident"—the trigger for these consequences—encompasses wide swaths of protected expression. The CCRS poses a grave risk of chilling the open and unfettered discourse that should be central to higher education.

## JURISDICTION AND VENUE

6.      This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought via 42 U.S.C. §§1983 and 1988.

7.      The Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343.

8.      Venue is proper under 28 U.S.C. §1391 because the events giving rise to the claims occurred in the Southern District of Iowa.

## PARTIES

9.      Plaintiff Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens. Speech First is dedicated to preserving civil rights secured by law, including the freedom of speech guaranteed by the First Amendment. Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. Speech First has members who attend the University.

10.     Iowa State University of Science and Technology is a public university organized and existing under the laws of Iowa.

11.     The University is governed by its State Board of Regents, which delegates certain authority and responsibilities to others, including other Defendants in this case.

12.    Defendant Wendy Wintersteen is President of the University. Wintersteen is responsible for the enactment and enforcement of University policies, including the policies challenged here. Wintersteen is sued in her official capacity.

13.    Defendant Martino Harmon is Senior Vice President for Student Affairs. He is responsible for student conduct and the University's student disciplinary regulations. Harmon is sued in his official capacity.

14.    Defendant Vernon J. Hurte is Dean of Students. He oversees 16 departments and initiatives, including the Office of Student Conduct and certain bodies that handle student conduct hearings. Hurte also serves as a member of the CCRS. Hurte is sued in his official capacity.

15.    Defendant Sara Kellogg is Assistant Dean of Students and Director of the Office of Student Conduct. She oversees the enforcement of the student disciplinary regulations and administers the student disciplinary process. Kellogg is sued in her official capacity.

16.    Defendant Dawn Bratsch-Prince is Associate Provost for Faculty. She oversees the development of diversity policies and initiatives and is a member of the CCRS. Bratsch-Prince is sued in her official capacity.

17.    Defendant Margo Foreman is Assistant Vice President for Diversity and Inclusion and Equal Opportunity. She oversees the University's equal opportunity, affirmative action, discrimination, harassment, and sexual misconduct programs. Foreman also serves as the University's Title IX coordinator and is a member of the CCRS. Foreman is sued in her official capacity.

18.    Andrea Little is the Director of Employee and Labor Relations and a member of the CCRS. Little is sued in her official capacity.

19.    Jazzmine Brooks is the Equity and Inclusion Coordinator. She manages climate campus response efforts and is a member of the CCRS. Brooks is sued in her official capacity.

20.     Kenyatta Shamburger is Assistant Dean of Students and Director of Multicultural Student Affairs. He oversees the University office that supports students who self-identify as African American, Asian American, Native Hawaiian or other Pacific Islander, Latinx, Native American/Alaskan Native and/or Multiracial. He is also a member of the CCRS. Shamburger is sued in his official capacity.

21.     Pete Englin is Assistant Vice President for Student Affairs and Director of Residence Life. He is a member of the CCRS. Englin is sued in his official capacity.

22.     Virginia Speight is Associate Director of Residence Life. She oversees the University's residence life and facilities and is a member of the CCRS. Speight is sued in her official capacity.

23.     Reginald Stewart is Vice President for Diversity and Inclusion. He serves as the University's executive-level diversity and inclusion strategist and is a member of the CCRS. Stewart is sued in his official capacity.

24.     Michael Norton is University Counsel. He advises the University about its governance and compliance efforts and university policies. He is a member of the CCRS. Norton is sued in his official capacity.

25.     Michael Newton is Assistant Vice President and Chief of the University's Police Department. He oversees the University's public safety department, including the police and is a member of the CCRS. Newton is sued in his official capacity.

26.     Aaron Delashmutt is Assistant Chief of the University Police Department and is a member of the CCRS. Delashmutt is sued in his official capacity.

27.     Defendants Michael Richards, Patty Cownie, David Barker, Sherry Bates, Nancy Boettger, Milt Dakovich, Nancy Dunkel, Zack Leist, Jim Lindenmayer are the nine members of the Board of Regents, the governing body of Iowa State University. The Regent Defendants are

responsible for the adoption and authorization of policies that govern students at the University, including the policies challenged here. The Regent Defendants are sued in their official capacities.

## BACKGROUND

### I.  College students have robust First Amendment rights.

28.    "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

29.    The First Amendment's importance is at its apex at our nation's colleges and universities. "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher education]. The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 476 (1960)).

30.    The core principles of the First Amendment "acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission." *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967)). "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957). The First Amendment's protections, moreover, are "not confined to the supervised and ordained discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock Found.*, 478 F. Supp. at 102.

31.    Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180. "The mere dissemination of ideas—

no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish*, 410 U.S. at 670. Indeed, "the point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995).

## II.    The University's chalking policy unconstitutionally restricts speech.

32.    For years, students across the country have used chalking to express views on a host of topics. Chalking is a fun and efficient way to communicate because students can quickly create content with few materials. Additionally, chalk is easy to clean up and causes no harm to property.

33.    Students regularly use chalking to communicate political messages. Political chalking on college campuses was so prevalent in advance of the 2016 presidential election that it prompted a nation-wide movement. The movement resulted in the viral internet hashtag "#TheChalkening."

34.    Chalking at Iowa State also has a long history. Individuals and student groups have frequently used it to express political messages, engage in humor, and provide information about meetings and events.

35.    Many diverse individuals and groups participated in political chalking. Messages ranged from supporting Governor Kim Reynolds and President Trump to denouncing Congressman Steve King. Additionally, pro-life and pro-choice students chalked competing arguments about abortion.

36.    In the fall of 2019, the group "Students Against Racism" complained to the University about finding offensive chalked messages. Instead of handling the controversy in a measured way, the University took extreme measures and banned all chalking.

37.    Then, on November 11, 2019, the University promulgated an interim chalking policy severely limiting students' ability to participate in chalking.

38.    The chalking policy defines chalking as "the marking of a sidewalk surface with chalk in order to publicize an upcoming event sponsored by a registered student organization."

39.     The policy limits chalking to registered student organizations. Those organizations can chalk only to publicize upcoming events that are open to all students. "**The chalking must include, and must be limited to,** the event title (may not exceed seven words), event location and time, and the name of the sponsoring registered student organization." Chalking Policy §A.

40.     The policy further prohibits individuals or student organizations from "eras[ing], remov[ing], effac[ing], writ[ing] over, modify[ing], or otherwise impair[ing] the legibility of any chalking" done pursuant to the Policy. Chalking Policy §B.

41.     Students and student organizations who violate the chalking policy can face disciplinary sanctions, be forced to pay removal costs, or forfeit their registration status and ability to reserve space on campus.

42.     The chalking policy imposes content-based and speaker-based restrictions on protected speech in a traditional public forum. It also bans core political speech, including support or opposition to state legislative candidates and presidential primary candidates in the run-up to the 2020 elections.

43.     The chalking policy violates Iowa law, which requires that "[a] member of the campus community who wishes to engage in noncommercial expressive activity in outdoor areas of campus shall be permitted to do so freely," with exceptions not applicable here. Iowa Code Ann. §261H.3(2).

III.    **The University's acceptable use policy unconstitutionally restricts core political speech.**

44.     The University provides every student with a University email address. In fact, "students are expected to have a University . . . email address" and to read all emails from the University "within a reasonable amount of time." The University also allows students and guests to connect to its wireless internet.

45.     Students commonly use University-provided emails and internet access for personal communication.

- 8 -

46.     Emails are important for communicating political messages. Email is an easy and quick way to reach people, and political campaigns frequently use email to connect with voters, including students.

47.     Students who engage in political debates or volunteer for campaigns also commonly use emails to communicate with other students. Since students commonly seek out the views of their peers, student-to-student emails are a particularly effective means of political speech, organization, and association. Indeed, the University itself recognizes that "[i]n particular, e-mail is a powerful communication tool."

48.     The University maintains an Acceptable Use of Technology Resources Policy. The acceptable use policy applies to all users of the University's information resources, including University email accounts provided to students. The Policy also applies to students' personal computers and devices that are connected to the University's network or internet service. AUP §2.

49.     Every student is "is required to know the policies and to conduct their activities within the scope of the AUP." AUP §2.

50.     Under section 4.5.7 of the acceptable use policy, students may not send "email[s] from a university account to solicit support for a candidate or ballot measure, or otherwise us[e] email systems in a concerted effort to support a candidate or ballot measure." AUP §4.5.7.

51.     Students who electronically distribute promotional materials of candidates for office or ballot measures are subject to disciplinary action. Students who violate these restraints on political speech may have their email and internet access suspended and may be referred for formal discipline. The university may also "assess a charge to offset the cost of the incident." AUP §5.3.

52.     Section 4.5.7 imposes content- and viewpoint-based restrictions on protected speech. While section 4.5.7 apparently allows students on campus to send emails *opposing* candidates and ballot measures, as well as emails about political issues not tied to a person or an issue on the ballot, the

policy forbids students on campus from using email to garner support for people and policies when it matters most—election season. That season is currently underway, as the Iowa caucuses and state legislative elections are quickly approaching.

**IV.   The University's Campus Climate Reporting System unconstitutionally chills speech.**

53.     The University operates what it calls the Campus Climate Reporting System. The CCRS is "a university-wide collaborative unit that gathers information on and responds to reported incidents of bias that affect" the University community.

54.     Originally named the Campus Climate Response Team, the idea for the CCRS was hatched in 2016. The inspiration, according to the University, was the fact that "[w]e were in the middle of a political campaign cycle that was different than we had experienced and wanted to get ahead of how to productively respond when that cycle impacted campus." The Campus Climate Response Team was renamed the CCRS in November 2019 "in response to demands made October 30, 2019, by Students Against Racism." Other than the name change, however, the CCRS is indistinguishable from its predecessor.

55.     Large swaths of the CCRS's websites and policies are taken word-for-word from the websites and policies of the Campus Climate Response Team at the University of Texas at Austin.

56.     The CCRS's members include representatives from the offices of the Dean of Students, Equal Opportunity, University Human Resources, University Relations, Multicultural Student Affairs, Department of Residence, various Vice Presidents, and the University Police Department. The CCRS "[p]artners" with the Dean of Students Office, Department of Residence, ISU Police Department, and other University offices. The CCRS does not have any members who are trained counselors from the University's separate Student Counseling Services.

57.     The CCRS "team" meets "regularly throughout the year." "The team is in constant communication and assembles quickly whenever there is an incident."

58.     According to the University's President, she and the University's leadership team "start every morning with a phone call so that we can hear from our campus climate response system about what has happened in the previous day."

59.     The CCRS was created to quickly respond to so-called "bias incidents" or "campus climate incidents." The CCRS is designed to serve as an "accelerator" to "reduce manifestation of bias that negatively impact the community." Its "primary function" is "to respond to reported incidents of bias in an appropriate and timely manner." "Through the work of the CCR[S], bias incidents can be documented in a standardized way and addressed swiftly and pointedly."

60.     The "core functions" of the CCRS include "[s]haring information with administrative unit partners who may determine that investigations by their units are warranted"; "[c]ollecting information on reports of bias across campus"; "[p]roviding support for those who report being impacted by hate, intolerance, or bias on campus"; "[e]ncouraging constructive dialogue and facilitating conversations amongst those involved"; "analyzing trend data to effectively target education and awareness"; "[r]aising awareness of issues impacting campus climate"; and "[e]ncouraging a culture of civility and respect."

61.     Because bias incidents "negatively impact ... the overall campus climate," the CCRS enlists "all community members to continue to report incidents of bias." Bias incidents should be reported, according to the University, whether they occur "on or off campus." These incidents "are serious incidents that can have long-lasting, serious effects on the Iowa State University community and are not tolerated."

62.     "Reports may be submitted by various individuals impacted by the incident, including the victim(s), witness(es), or a third party who was informed of the incident but was not present at the time of its occurance [sic]." Reports can also be submitted anonymously.

63.     The definition of "bias incident" is broad and vague. The University defines "bias" as "[d]ifferential preference for one person, group, or identity over another." Under the heading "What is the definition of a bias incident?", the University states that "[b]ias incidents reflect a similar motivation as hate crimes," which is elsewhere defined as "crimes committed against a person or their property 'because of the person's race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability, or the person's association with a person'" falling into one of those categories. As examples of such incidents, the University has listed speech that someone perceives as "demeaning," "taunting," "bullying," "verbal harassment," or "intimidation."

64.     Specific examples of bias incidents, according to the University, include "a student organization hosting a party with a racist theme," "[p]osts on social media or group chat apps pertaining to race, creed, religion, gender, or sex," and "[c]ommentary in the classroom perceived as derogatory or biased." Other examples that the University gave in the past include comments like "[w]e need fresh faces around here," "[a]theists are going to hell," and "[b]uild the wall."

65.     Reports of bias incidents can be submitted to the CCRS in person at the Office of Equal Opportunity, by phone, or on the internet through a web-based form labeled "Report an Incident." The University urges students to "Pay close attention to the date, time, and location of the incident" because "[p]roviding as many facts as possible assists in the response to the incident"; "Describe the incident with as much detail as possible"; "Identify the offender(s) by name and/or Iowa State affiliation, if known"; "Include phsycial [sic] descriptors when possible (for example: age, height, race, ethnicity, clothing, etc.)"; and "List possible witness(es) by name with contact information" and "please indicate whether there were witnesses to the incident."

66.     The online report form has spaces for Legal Name, Preferred Name, Pronouns, Gender, Affiliation with ISU, Phone Number, and Email Address. It asks, "What is your association with the incident?" and has checkboxes for Victim, Witness, Third Party, and Other, which the

reporter must select. The online form has a space for Date of Incident and asks for the Approximate Time of Incident. It then asks, "Did the incident occur on campus?" and has checkboxes for Yes or No. The form has a space for Location(s) of Incident, which the reporter must fill out. The form has a space for the reporter to "[p]rovide the facts of the incident in as much detail as possible," which the reporter must fill out. The space explains that the reporter should "[d]escribe all comments, conduct, gestures, markings, physical injuries, property damage, etc." It also asks the reporter to "[p]lease describe how you are impacted by the incident"; asks "[h]as this incident negatively impacted you?" with checkboxes for Yes or No; and gives a reporter the option to "provide documents to the CCRS."

67.    The online form has additional questions and spaces "[i]f the incident is bias-related." It first asks the reporter, "[W]hat is the perceived motive for the bias?" and has checkboxes for Race, Ethnicity, Sex, Pregnancy, Color, Religion/Creed, National Origin, Age, Marital Status, Physical or Mental Disability, Sexual Orientation, Gender Identity, Ex-Offender, Gender Expression, Genetic Information, Status as a U.S. Veteran, Retaliation for Raising Concerns/Complaints, and Other. The form then asks three questions: "Have you reported the incident to another ISU office?" with the option to select Yes or No; "What response did you receive from the office to which you initially reported the incident?" with a space for the reporter to comment; and "Would you like to be contacted by a CCRS representative?" with the option to select Yes or No.

68.    The CCRS maintains a detailed database of the reports it receives, which is managed by the Office of Equal Opportunity's Inclusion Coordinator. "Information is kept confidential" only "to the extent possible." When the CCRS believes it is "appropriate," it shares "bias incident" information "with administrative partners who may deem it necessary to investigate the situation." The University can also "determine if and when it is appropriate to notify the wider campus community of an incident."

69.   The CCRS received reports of more than one hundred independent "bias incidents" during the 2018 fiscal year.

70.   "Digital" bias incidents made up 21% of reports, and "epithets" made up nearly 14%.

71.   Examples of bias incidents actually reported to the CCRS in 2018 include: seeing written "support for [Congressman] Steve King, [Governor] Kim Reynolds, and [President] Donald Trump"; the student government discussing a bill allowing student organizations to limit membership based on "the group's beliefs and standards," which was interpreted as "discrimination against the LGBT community"; and seeing a video of an incoming student "sharing and stating hateful speech" about the use of pronouns.

72.   The CCRS "responds to every reported incident of bias." "Responses are determined on a case-by-case basis." "Every effort will be made to respect the claimant's decision about how to proceed after filing a report."

73.   When the CCRS receives a report, it "assesses the incident, determines the appropriate lead(s) to handle the response and communicates next steps." It implores students to "not try to investigate to determine [whether] the … incident took place" because "[a] Campus Climate Response System (CCRS) partner … will determine the proper next steps and authenticity of the information."

74.   The CCRS "outreaches to the reporter within two business days." It makes additional attempts (up to 2) to contact the incident reporter by phone or email. "This outreach typically occurs via email, but some reporters receive[] direct phone calls." According to one official, "If we have contact information -- a name or email, for example – there's always an outreach." "We say within two business days, but it's always sooner – it's immediate, really."

75.   While "[a] lot of times, [the CCRS'] outreach is for people who want to be heard," "sometimes it needs more corrective steps, and sometimes we realize this really is an EO issue that rises to the level of investigation."

76.     In 2018, the CCRS took steps beyond initial outreach in 56.4% of reported cases, including "meeting with individual(s) identified as committing the bias to discuss impact and institutional values" and "cooperating with police investigations of criminal acts that may have also been reported as bias incidents." The CCRS will also engage in "constructive dialogue" with individuals accused of committing bias incidents, and "[r]eports through the website are referred to the appropriate partner who will determine what, if any, next steps will be taken by their administrative unit."

77.     "Failure to comply with the directive of authorized university officials or police officers" and "[f]ailure to appear before any university … regulatory body as summoned" constitute "contempt" under the University's code of conduct and subject a student to formal discipline.

78.     According to the CCRS's reporting website, "[i]f the decision is made to pursue disciplinary action against the person who engaged in the conduct, certain information related to the report will be shared with that person" and "[w]itnesses may also be made aware of certain information."

79.     A 2017 report from FIRE found that bias-response teams lead to "a surveillance state on campus where students and faculty must guard their every utterance for fear of being reported to and investigated by the administration." Bias Response Team Report 2017, at 28 (Feb. 2017), bit.ly/2P9iEaj. "While universities should certainly be listening to their students and offering resources to those who encounter meaningful difficulties in their life on campus, the posture taken by many Bias Response Teams is all too likely to create profound risks to freedom of expression, freedom of association, and academic freedom on campus." *Id.* at 5; *see also* Jeffrey Snyder & Amna Khalid, *The Rise of "Bias Response Teams" on Campus*, The New Republic (Mar. 30, 2016), bit.ly/1SaAiDB (arguing that bias-response teams "result in a troubling silence: Students, staff, and faculty [are] afraid to speak

their minds, and individuals or groups [are] able to leverage bias reporting policies to shut down unpopular or minority viewpoints").

80.     Other universities have likewise discovered that bias-response teams chill student speech. The University of Northern Colorado, for example, shuttered its bias-response team in 2016, explaining that it had come "at the expense of free speech and academic freedom" and that its so-called "voluntary" processes "made people feel that we were telling them what they should and shouldn't say."

81.     The University of Iowa likewise scrapped its plans to create a bias response team, citing their "high failure rate" and their tendency to "become almost punitive."

**V.     The University's unconstitutional policies are fostering a campus environment that chills protected expression and fails to protect students' First Amendment rights.**

82.     The University's policies are irreparably harming countless students who seek to express themselves and voice their opinions without fear of investigation or punishment. The University's policies are especially likely to chill or deter speech on controversial or politically charged topics, as well as humor, satire, and parody. The result is that all University students lose the opportunity to challenge, debate, and learn from the views and experiences of their classmates.

83.     The University's policies have fostered a campus environment that is particularly inhospitable to free expression. Several recent examples are illustrative.

84.     In September 2019, a University professor led a classroom discussion about abortion and birth control. One student stated that these topics should be considered "women's issues." Another student objected, complaining that describing abortion and birth control as "women's issues" "erases trans men and people who are non-binary who get abortions and/or use birth control." When the professor refused to take sides, the complaining student reported the professor to the CCRS for committing a "bias incident." The student reported that the professor was biased for not giving "push back … to get students to be more inclusive" but instead "repeat[ing] this erasure."

85.     Until 2016, the University maintained "discrimination" and "harassment" policies that flagrantly violated the First Amendment. The University prohibited speech that, "although not severe, persistent, or pervasive enough to meet the legal definition of harassment," was nevertheless "unacceptable" to the University based on a list of subjective requirements, such as the speaker's "tone of voice," the "degree to which the expression was necessary to the discussion," and "[w]hether the speech is … recognized by peers as a legitimate topic." Perhaps worse, the University required students to pledge compliance with these policies and attend an annual training course, or else they could not graduate. The University would not change these policies until it was sued by a student (represented by the Alliance Defending Freedom). *See Dunn v. Leath*, No. 4:16-cv-553-JAJ-CFB (S.D. Iowa). It persisted even though, as early as 2012, FIRE wrote that "it is difficult to conceive of two harassment policies at the same school that could more badly misinform students of their expressive rights." When criticized by FIRE in 2012, the University's associate legal counsel stated, "We just have a difference of opinions here."

86.     In February 2019, the University's student government endorsed two bills introduced in the Iowa legislature that would protect students' right to free speech at public universities. Outraged, LGBT groups, the College Democrats, and other students organized protests. They complained that the legislation would prohibit universities from "deny[ing] any benefit or privilege to a student organization based on the student organization's requirement that the leaders of the student organization agree to and support the student organization's beliefs"—a provision they said would allow Christian organizations to deny leadership to students who are sexually active or in same-sex relationships. They opposed this provision even though this Court had recently held that such accommodations are constitutionally required. *See Bus. Leaders in Christ v. Univ. of Iowa*, 360 F. Supp. 3d 885 (S.D. Iowa 2019). Nevertheless, the backlash worked, and the student government rescinded its endorsement of the free-speech legislation.

87.     The Eighth Circuit recently held that the University engaged in illegal viewpoint discrimination by denying a trademark to a student organization. The Court found that the University had violated "clearly established" First Amendment law because it acted with a "discriminatory motive." The University subjected the group to "unique scrutiny," invented ad hoc procedural requirements, gave pretextual justifications for denying the trademark, and acted with "political motives" in response to political pressure. *Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017).

88.     These recent events reinforce what the University's official policies already make clear—that certain viewpoints are not welcome on campus and will be met with retribution from the University and others.

## VI.     The University's unconstitutional policies are causing concrete and direct injuries to Speech First's members.

89.     Speech First's members who attend the University are suffering concrete injuries as a direct result of the University's unconstitutional policies and actions. These students want to engage in speech that is clearly prohibited by the University's chalking policy, acceptable use policy, and "bias incidents" policy, and they credibly fear that the expression of their deeply held views will be considered "biased" and reported to the CCRS.

90.     One Speech First member ("Student A") is a sophomore at the University.

91.     Student A typically supports Republican candidates for public office, including Senator Joni Ernst and President Donald Trump. Student A is conservative, opposes abortion, supports building a border wall, and opposes the "all-ages drag shows" that are held at the local public library.

92.     Student A's views are deeply held, and he would like to debate them freely and persuade others of their correctness on campus, online, and in the city of Ames. But Student A censors what he says, and how he says it, for fear that someone will deem his speech a "bias incident" and report it to the CCRS. For example, but for the CCRS, Student A would participate in counter-protests to the "all-ages drag shows," an affirmative action bake sale, and a "build the wall" demonstration.

But he refrains because he knows similar activities have been reported to the CCRS, and that the same activities have been reported to bias response teams at other universities (including the University of Iowa).

93.     But for the University's chalking policy, Student A would chalk messages on University sidewalks. He believes chalking is a fun way to spend time with like-minded students, as well as a visually striking way to communicate a message that is open to all students. If the University had not banned it, Student A would chalk, among other messages, campaign slogans of the Iowa state representatives he supports, "Vote Trump," "Trump 2020," "Joni 2020," "Vote Joni," and "Vote Joni – Conservative, Pro Life."

94.     Student A has a University email account, and he frequently uses his personal email account while logged onto the University's network. But for section 4.5.7 of the acceptable use policy, Student A would send emails to lists of students urging them to vote for Republican candidates and urging them to vote for the most moderate Democratic candidate for President. Student A would also send such emails from his University account, as it would give him more credibility with students he does not know very well.

95.     Another Speech First member ("Student B") is a junior at the University.

96.     Student B is a strong supporter of the Second Amendment and gun rights, supports President Trump's reelection, opposes communism and socialism, is pro-life, opposes open borders, supports robust First Amendment freedoms, and opposes Medicare for All.

97.     Student B wants to freely and openly express his views on campus, online, and in the city of Ames, as well as openly debate them with other students and change their minds. But Student B refrains from doing so because he fears someone will deem his speech a "bias incident" and report it to the CCRS. In Student B's words, "If I say one thing in front of the wrong person, I'll get reported to the CCRS." For example, he fears that others will deem his views on abortion and immigration

"biased," or report him for expressing his view that "hate speech is free speech." He is especially afraid to discuss LGBTQ issues on campus.

98.     Student B chalked messages on University sidewalks before the University enacted its chalking policy and, absent that policy, he would do so again. Student B believes that chalking is a great way to meet and associate with students who have similar views, and is one of the only effective methods of communicating with large numbers of students. Student B would chalk, among other messages, anti-communism messages (e.g., a hammer and sickle crossed out and the message "100 million dead"), "The Second Amendment defends the First Amendment," "Trump 2020," and "MAGA."

99.     Another Speech First member ("Student C") is a sophomore at the University.

100.     Student C is a devout Christian, supports Republican candidates for public office, and strongly supports guns rights and the Second Amendment.

101.     Student C chalked messages on University sidewalks before the University enacted its chalking policy and, absent that policy, he would do so again. Like Students A and B, Student C believes chalking is a fun way for groups of students to express themselves and associate with like-minded students, and is an unparalleled method of getting a message out on campus. Student C would chalk, among other messages, "Jesus loves you," pro-gun facts (e.g., "You're six times more likely to die because of a knife than a rifle"), and support for campus carry laws (e.g., "1 out of 10 Iowans have a permit to carry a weapon, why can't they carry here?").

102.     Student C has a University email account and often uses his personal account while logged onto the University's network. But for section 4.5.7 of the acceptable use policy, Student C would send emails while on the University's network encouraging students to support Republican candidates, pro-gun candidates, and ballot issues involving guns.

**COUNT I**
**Violation of the First Amendment**
**("Chalking Policy")**

103.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

104.    The Supreme Court has consistently recognized the "substantial and expansive threats to free expression posed by content-based restrictions." *United States v. Alvarez*, 567 U.S. 709, 717 (2012). "Content-based regulations are" therefore "presumptively invalid." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992).

105.    "The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230 (2015). Policies cannot "suppress disfavored speech." *Id.* at 2229. Nor can they "distinguis[h] among different speakers, allowing speech by some but not others." *NIFLA v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (cleaned up).

106.    "[A]ny restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

107.    The outdoor areas of the University, including its sidewalks, are a traditional public forum. Iowa Code Ann. §261H.4(1).

108.    Under the University's chalking policy, no student can chalk on University sidewalks without being a member of a registered student organization. Those registered student organizations may chalk only limited information about particular events.

109.    The University has no compelling interest in restricting speech in this manner. Nor would the rule be narrowly tailored to any compelling interest, particularly because the policy violates Iowa state law. *See* Iowa Code Ann. §§261H.1 *et seq.*

110.    Defendants adopted this unconstitutional policy under color of state law.

**COUNT II**
**Violation of the First Amendment**
**("Acceptable Use Policy")**

111.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

112.    Content-based restrictions on speech are "presumptively invalid" under the First Amendment. *R.A.V.*, 505 U.S. at 382. And "viewpoint discrimination is an 'egregious form of content discrimination.'" *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019).

113.    "[A]ny restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

114.    Section 4.5.7 of the University's acceptable use policy prohibits students from communicating electronically in support of candidates or ballot measures. It is a content-based and viewpoint-based restriction on speech.

115.    The University's email accounts, servers, internet, and wi-fi networks are traditional public forums, at least for students.

116.    The University has no compelling interest in prohibiting this political speech. Nor is section 4.5.7 narrowly tailored to any compelling interest advanced by the University. And the policy's viewpoint discrimination "end[s] the matter" in terms of its constitutionality. *Iancu*, 139 S. Ct. at 2302.

117.    Defendants adopted this unconstitutional policy under color of state law.

**COUNT III**
**Violation of the First Amendment**
**(CCRS)**

118.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

119.    The First Amendment prohibits State officials at public universities from adopting regulations of students that are "so broad as to chill the exercise of free speech and expression." *Dambrot v. Cent. Michigan University*, 55 F.3d 1177, 1182 (6th Cir. 1995). "Because First Amendment

freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972).

120.    "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). The Court must find such regulations facially unconstitutional because "the threat of enforcement of an overbroad [regulation] may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

121.    The University's definition of "bias incident" encompasses speech that is fully protected under the First Amendment. Actual enforcement history confirms that the definition does not exempt protected speech.

122.    The "bias incidents" policy is a content-based and viewpoint-based restriction on speech. It is presumptively unconstitutional and cannot possibly survive strict scrutiny.

123.    The policy is also unconstitutionally overbroad as it encompasses protected speech, and there are a substantial number of instances where the policy cannot be applied consistent with the First Amendment.

124.    Even if students cannot be formally disciplined for committing "bias incidents," the CCRS apparatus objectively chills speech by threatening students with negative consequences (including referrals to the University's disciplinarians) and by subjecting them to burdensome administrative processes (including meetings with University administrators). *See Speech First, Inc. v. Schlissel,* 939 F.3d 756 (6th Cir. 2019).

125.    This overbroad policy chills protected speech and expression.

126.    Defendants adopted this unconstitutional policy under color of state law.

**COUNT IV**
**Violation of the First and Fourteenth Amendments: Void for Vagueness**
**(CCRS)**

127.    Plaintiff repeats and realleges each of the prior allegations in this complaint.

128.    "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007).

129.    "With respect to the first goal, … '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id.* (quoting *Grayned*, 408 U.S., at 108-09).

130.    This principle of clarity is especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). "Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law." *Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

131.    The University's definition of "bias incident" is amorphous and entirely subjective, using undefined terms like "demeaning" and turning on what the listener "perceives."

132.    The absence of a clear standard creates a serious risk that this prohibition will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed.

133.    The University's prohibitions on "bias incidents" are thus void for vagueness.

134.    Defendants adopted this unconstitutionally vague policy under color of state law.

**WHEREFORE**, Plaintiff Speech First respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants and provide the following relief:

A.    A declaratory judgment that the chalking policy violates the First Amendment;

B.    A declaratory judgment that section 4.5.7 of the acceptable use policy violates the First Amendment;

C.    A declaratory judgment that the CCRS and the "bias incidents" policy violates the First and Fourteenth Amendments;

D.    A permanent injunction barring Defendants from enforcing the University's chalking policy;

E.    A permanent injunction barring Defendants from enforcing section 4.5.7 of the acceptable use policy;

F.    A permanent injunction barring Defendants from using the CCRS to investigate, threaten, refer, or punish (including informal punishments) students for bias incidents;

G.    A preliminary injunction granting the relief specified above during the pendency of this action;

H.    Plaintiff's reasonable costs and expenses of this action, including attorneys' fees, per 42 U.S.C. §1988 and all other applicable laws; and

I.    All other further relief to which Plaintiff might be entitled.

Respectfully submitted,

Dated: January 2, 2020

_/s/ Skylar J. Limkemann_

Thomas R. McCarthy (pro hac vice
forthcoming, lead counsel)
J. Michael Connolly
Cameron T. Norris (pro hac vice
forthcoming)
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com

Skylar J. Limkemann  AT0012324
Smith Mills Schrock Blades PC
118 3rd Ave. SE, Suite 200
P.O. Box 36
Cedar Rapids, IA 52406-0036
Telephone: (319) 286-1743
Fax: (319) 286-1748
Email: SLimkemann@smithmillslaw.com

_Counsel for Plaintiff Speech First, Inc._