**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| SPEECH FIRST, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> Wendy WINTERSTEEN, in her official capacity as President of Iowa State University of Science and Technology, et al., <br><br> *Defendants*. | Case No. 4:20-cv-2-SMR-SBJ <br><br> **PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** <br><br> **(Oral Argument Requested)** |

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................................... iii

Introduction ................................................................................................................................... 1

Background ..................................................................................................................................... 2

    I.   The Challenged Policies ...................................................................................................... 2

        A.  The Chalking Policy ................................................................................................. 2

        B.  The Acceptable Use Policy's Ban on Political Emails ........................................ 3

        C.  The Policy on "Bias Incidents" and the Campus Climate Reporting System ...................... 4

    II.  Speech First and This Litigation .......................................................................................... 8

Argument ....................................................................................................................................... 9

    I.   Speech First is likely to prevail on the merits. .................................................................. 9

        A.  The chalking policy violates the First Amendment. ............................................. 10

        B.  The political-emails policy violates the First Amendment. ................................... 11

        C.  The bias-incidents policy violates the First and Fourteenth Amendments. ...................... 12

    II.  Speech First satisfies the remaining preliminary-injunction criteria. ........................... 14

Conclusion ..................................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*Am. Future Sys., Inc. v. Penn. State Univ.,*
  752 F.2d 854 (3d Cir. 1984) ...................................................................................... 11

*Ass'n of Cleveland Fire Fighters v. City of Cleveland,*
  502 F.3d 545 (6th Cir. 2007) ................................................................................ 13, 14

*Bair v. Shippensburg Univ.,*
  280 F. Supp. 2d 357 (M.D. Pa. 2003) ........................................................................ 15

*Bus. Leaders in Christ v. Univ. of Iowa,*
  360 F. Supp. 3d 885 (S.D. Iowa 2019) .................................................................. 15, 16

*CBS, Inc. v. FCC,*
  629 F.2d 1 (D.C. Cir. 1980) ......................................................................................... 1

*Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1,*
  690 F.3d 996 (8th Cir. 2012) ..................................................................................... 15

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ................................................................................................ 9, 11

*Coates v. City of Cincinnati,*
  402 U.S. 611 (1971) .................................................................................................... 14

*Connally v. Gen. Constr. Co.,*
  269 U.S. 385 (1925) .................................................................................................... 14

*Dambrot v. Cent. Michigan Univ.,*
  55 F.3d 1177 (6th Cir. 1995) ...................................................................................... 14

*DeJohn v. Temple Univ.,*
  537 F.3d 301 (3d Cir. 2008) ....................................................................................... 14

*Doe v. Univ. of Mich.,*
  721 F. Supp. 852 (E.D. Mich. 1989) .......................................................................... 10

*Elrod v. Burns,*
  427 U.S. 347 (1976) .................................................................................................... 15

*Gerlich v. Leath,*
  152 F. Supp. 3d 1152 (S.D. Iowa 2016) ..................................................................... 16

*Gooding v. Wilson,*
  405 U.S. 518 (1972) .................................................................................................... 13

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ......................................................................................................13, 14

*Healy v. James,*
  408 U.S. 169 (1972) ...........................................................................................................1, 9, 10

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,*
  515 U.S. 557 (1995) ...............................................................................................................13

*Iancu v. Brunetti,*
  139 S. Ct. 2294 (2019) ...........................................................................................................13

*InterVarsity Christian Fellowship/USA v. Univ. of Iowa,*
  2019 WL 5059854 (S.D. Iowa 2019) .....................................................................................15

*Iowa Right to Life Comm., Inc. v. Williams,*
  187 F.3d 963 (8th Cir. 1999) .................................................................................................15

*James v. Nelson,*
  349 F. Supp. 1061 (N.D. Ill. 1972) ......................................................................................10

*Johnson v. Minneapolis Park & Recreation Bd.,*
  729 F.3d 1094 (8th Cir. 2013) ...............................................................................................15

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.,*
  540 F.3d 752 (8th Cir. 2008) .................................................................................................15

*Matal v. Tam,*
  137 S. Ct. 1744 (2017) ...........................................................................................................13

*McCauley v. Univ. of the Virgin Islands,*
  618 F.3d 232 (3d Cir. 2010) ..................................................................................................14

*Minn. Citizens Concerned for Life, Inc. v. Swanson,*
  692 F.3d 864 (8th Cir. 2012) (en banc) .............................................................................9, 14

*N.Y. Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ...............................................................................................................16

*NIFLA v. Becerra,*
  138 S. Ct. 2361 (2018) ......................................................................................................11, 12

*Packingham v. North Carolina,*
  137 S. Ct. 1730 (2017) ...........................................................................................................11

*Papish v. Bd. of Curators of Univ. of Mo.,*
  410 U.S. 667 (1973) ...............................................................................................................10

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) ..................................................................................................... 10

*Phelps-Roper v. Nixon,*
    509 F.3d 480 (8th Cir. 2007) ................................................................................. 15, 16

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) ............................................................................................. 10, 12

*R.A.V. v. City of St. Paul, Minn.,*
    505 U.S. 377 (1992) ........................................................................................ 11, 12, 13

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ......................................................................................... 10, 12

*Rodgers v. Bryant,*
    942 F.3d 451 (8th Cir. 2019) ........................................................................................ 9

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ................................................................................................... 12

*Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities,*
    359 U.S. 344 (1959) ................................................................................................... 14

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ............................................................................................... 9, 15

*Solid Rock Found. v. Ohio State Univ.,*
    478 F. Supp. 96 (S.D. Ohio 1979) ........................................................................ 1, 10

*Sweezy v. N.H. ex rel. Wyman,*
    354 U.S. 234 (1957) ................................................................................................... 10

*United States v. Alvarez,*
    567 U.S. 709 (2012) ................................................................................................... 10

*United States v. Stevens,*
    559 U.S. 460 (2010) ................................................................................................... 13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ................................................................................................... 14

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ................................................................................................... 13

**Statutes**

Iowa Code Ann. §261H.3(2) ............................................................................................. 11

Iowa Code Ann. §261H.4(1) ............................................................................................. 10

# INTRODUCTION

"[N]o speech is more protected than political speech," and the need for unfettered political speech "is nowhere stronger than in the area of elections." *CBS, Inc. v. FCC*, 629 F.2d 1, 24 (D.C. Cir. 1980), *aff'd*, 453 U.S. 367 (1981). On top of that, "the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American [universities]." *Healy v. James*, 408 U.S. 169, 180 (1972). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock Found. v. Ohio State Univ.*, 478 F. Supp. 96, 102 (S.D. Ohio 1979). Yet Iowa State University and its officials have created a series of rules and regulations that restrain, deter, suppress, and punish speech about the political and social issues of the day. And the University has done so despite Iowa's central role as the "first in the nation" to weigh in on presidential elections.

Plaintiff, Speech First, Inc., is a nationwide membership organization of students, alumni, and other concerned citizens—including current students at the University—dedicated to preserving the freedom of speech. Speech First seeks a preliminary injunction to enjoin three University practices and policies that have a profound chilling effect on its members' protected expression.

First, the University prohibits the vast majority of students from "chalking"—i.e., writing messages on campus sidewalks with chalk. This chalking policy allows only registered student organizations to advertise certain events, to the exclusion of all other students and messages. Under the University's policy, students who "chalk" an unauthorized message face discipline. This content- and speaker-based restriction on speech in a traditional public forum violates the First Amendment.

Second, the University's acceptable use policy prohibits students from using email to support candidates or ballot issues. This content-based prohibition on core protected speech is backed by the threat of formal discipline. It, too, violates the First Amendment.

Third, the University employs a Campus Climate Reporting System ("CCRS"), a team of University administrators and police chiefs who respond to "bias incidents" and refer them to the University's "administrative unit partners" for investigation. The University amorphously defines bias incidents to include speech (whether on or off campus) that someone perceives as "demeaning," "taunting," "bullying," "verbal harassment," or "intimidation." Students accused of a bias incidents risk referral to University officials for investigation and discipline. Yet the definition of "bias incident" (the trigger for these consequences) encompasses wide swaths of protected speech. The CCRS poses a grave risk of chilling the open and unfettered discourse that should be central to higher education. Its bureaucratic processes—and the vague, overbroad definition of "bias incident" that triggers them—violate the First and Fourteenth Amendments.

Speech First will likely prevail on the merits of these claims and readily satisfies the remaining criteria for a preliminary injunction. The deprivation of core constitutional rights, even for a brief period of time, is an irreparable injury, and remedying such deprivations is always in the public interest. Speech First thus respectfully asks this Court to grant its motion for a preliminary injunction.

## BACKGROUND

I.    **The Challenged Policies**

    A.    **The Chalking Policy**

For years, students across the country have chalked messages on campus sidewalks to express their views on a host of topics. Chalking is a fun and efficient way to communicate because students can get together and quickly create content with few materials. Neily Decl. ¶11. Chalk is also easy to clean, and causes no harm to property. College students regularly use chalk to communicate political messages. Political chalking on college campuses was so prevalent during the 2016 elections that it prompted a nationwide movement called "#TheChalkening." Norris Decl., Exs. 4; 5.

Chalking also has a long history at Iowa State. Students at the University have frequently chalked campus sidewalks to express political messages, engage in humor, and provide information.

Many diverse individuals and groups have used chalking to communicate political messages, such as support for Governor Kim Reynolds and President Trump, criticisms of Congressman Steve King, and competing pro-life and pro-choice arguments about abortion. Exs. 2; 3.

In November 2019, however, the University promulgated a new chalking policy that severely limits students' right to chalk. Norris Decl., Exs. 1; 6. The policy limits chalking to registered student organizations. Those organizations can chalk only to publicize upcoming events that are open to all students. According to the policy, "**[t]he chalking must include, and must be limited to,** the event title (may not exceed seven words), event location and time, and the name of the sponsoring registered student organization." Ex. 1, §A (bold in original). Students who violate the chalking policy can face disciplinary sanctions, be forced to pay removal costs, or forfeit their ability to reserve space on campus. Ex. 1.

### B.   The Acceptable Use Policy's Ban on Political Emails

The University provides every student with an email address. In fact, "students are expected to have a University ... email address" and to read all emails from the University "within a reasonable amount of time." Ex. 8 at 1. The University also allows students and guests to connect to its wireless network, and students commonly use their University emails and internet access for personal speech and communication. Personal use is generally allowed. Ex. 7, §3.

Emails are an important platform for political speech. Since email is a "quick[] and efficient[]" way to reach people, Ex. 8 at 1, political campaigns frequently use it to connect with voters, including students. Students who engage in political debates or volunteer for campaigns also commonly use emails to communicate with other students. Since students often seek out the views of their peers, student-to-student emails are an effective means of political speech, organization, and association. Indeed, the University itself recognizes that "[i]n particular, e-mail is a powerful communication tool." Ex. 9 at 1.

The University maintains an Acceptable Use of Technology Resources Policy that governs all users of the University's information resources (computers, networks, email accounts, and the like). Ex. 7, §2. The policy also governs students' personal computers and devices when they are connected to the University's network. §2. Every student "is required to know the policies and to conduct their activities within the scope of the [acceptable use policy]." §2.

Under section 4.5.7 of the policy, students may not send "email[s] from a university account to solicit support for a candidate or ballot measure, or otherwise us[e] email systems in a concerted effort to support a candidate or ballot measure." Section 4.5.7 does not prohibit students from sending emails *opposing* candidates and ballot measures, or emails about political issues not tied to a person or an issue on the ballot. Students who violate this policy are subject to disciplinary action. The University can suspend their email and internet access, refer them for formal discipline, or "assess a charge to offset the cost of the incident." §5.

### C.      The Policy on "Bias Incidents" and the Campus Climate Reporting System

The University operates what it calls the Campus Climate Reporting System. The CCRS is "a university-wide collaborative unit that … responds to reported incidents of bias." Ex. 23 at 1. Originally named the Campus Climate Response Team, the CCRS was launched in response to the 2016 "political campaign cycle." Ex. 15 at 2. The team was renamed the CCRS "in response to demands made October 30, 2019, by Students Against Racism." Ex. 25. Other than the name change, however, the CCRS is indistinguishable from its predecessor and still calls itself a "team." *E.g.,* Ex. 11 at 1.

The CCRS's members are administrators from several university offices, including the Dean of Students, the Department of Residence, various Vice Presidents, and the University Police Department. *See* Exs. 11; 12 at 1. The CCRS "[p]artners" with these offices, which encompass the disciplinary arms of the University. Ex. 11. The CCRS does not have any members who are trained

counselors from the University's separate Student Counseling Services. *Cf. Staff*, Student Counseling Servs., Iowa State Univ., bit.ly/35u9SIh (last visited Jan. 6, 2019). The CCRS meets "regularly throughout the year," and the "team is in constant communication and assembles quickly whenever there is an incident." Ex. 11 at 1. According to the University's President, she and the University's leadership "start every morning with a phone call so that we can hear from our campus climate response system about what has happened in the previous day." Ex. 17 at 4.

The CCRS was created to quickly respond to so-called "bias incidents" (sometimes called "campus climate incidents"). Ex. 23 at 1. Bias incidents, the University declares, "are not tolerated." Ex. 13 at 2. The CCRS serves as an "accelerator" to "reduce manifestations of bias that negatively impact the community." Exs. 16 at 2; 23 at 1. Its "primary function" is "to respond to reported incidents of bias in an appropriate and timely manner." Ex. 23 at 3. "Through the work of the [CCRS], bias incidents can be documented in a standardized way and addressed swiftly and pointedly." Ex. 23 at 3. The "core functions" of the CCRS include "[s]haring information with administrative unit partners who may determine that investigations by their units are warranted," "[c]ollecting information on reports of bias across campus," and "analyzing trend data to effectively target education and awareness." Ex. 23 at 4.

The University's definition of "bias incident" is broad and vague. The University defines "bias" as "[d]ifferential preference for one person, group, or identity over another." Ex. 23 at 21. When asked "What is the definition of a bias incident?", the University states that "[b]ias incidents reflect a similar motivation as hate crimes," which are defined as "crimes committed against a person or their property 'because of the person's race, color, religion, ancestry, national origin, political affiliation, sex, sexual orientation, age, or disability, or the person's association with [such] a person.'" Ex. 13 at 2. As examples of bias incidents, the University lists speech that someone perceives as "demeaning," "taunting," "bullying," "verbal harassment," or "intimidation." Ex. 13 at 2. Specific

examples of bias incidents, according to the University, include "a student organization hosting a party with a racist theme," "[p]osts on social media or group chat apps pertaining to race, creed, religion, gender, or sex," and "[c]ommentary in the classroom perceived as derogatory or biased." Exs. 11 at 1; 23 at 18. Other examples that the University has given in the past include comments like "[w]e need fresh faces around here," "[a]theists are going to hell," and "[b]uild the wall." Ex. 20 at 1.

Because bias incidents "negatively impact ... the overall campus climate," the CCRS enlists "all community members … to report incidents of bias." Ex. 23 at 1, 19. Bias incidents should be reported, according to the University, whether they occur "on [or] off campus." Ex. 13 at 4; *see also* Ex. 23 at 19. "Reports may be submitted by various individuals impacted by the incident, including the victim(s), witness(es), or a third party who was informed of the incident but was not present at the time of its occur[e]nce." Ex. 18. Reports can also be submitted anonymously. Ex. 23 at 11.

Reports of bias incidents can be submitted to the CCRS in person, by phone, by email, or on the internet through a web-based form labeled "Report an Incident." Ex. 18. The University urges students to "Pay close attention to the date, time, and location of the incident" because "[p]roviding as many facts as possible assists in the response to the incident"; to "Describe the incident with as much detail as possible"; to "Identify the offender(s) by name and/or Iowa State affiliation, if known"; to "Include ph[ys]cial descriptors when possible (for example: age, height, race, ethnicity, clothing, etc.)"; and to "List possible witness(es) by name with contact information" and "please indicate whether there were witnesses to the incident." Ex. 18. The reporting form requests a similar level of detail. *See* Ex. 19.

The CCRS maintains a detailed database of the reports it receives, which is managed by the Office of Equal Opportunity. Ex. 23 at 11. "Information is kept confidential" only "to the extent possible." Ex. 13. When the CCRS believes it is "appropriate," it shares "bias incident" information "with administrative partners who may deem it necessary to investigate the situation." Ex. 23 at 4. The

University can also "determine if and when it is appropriate to notify the wider campus community of an incident." Ex. 23 at 11.

The CCRS received reports of more than one hundred independent "bias incidents" during the 2018 fiscal year. Ex. 23 at 14. "Digital" bias incidents made up 21% of reports, and "epithets" made up nearly 14%. Ex. 23 at 25. According to the University's response to a freedom-of-information request, examples of bias incidents actually reported to the CCRS include

- written "support for [Congressman] Steve King, [Governor] Kim Reynolds, and [President] Donald Trump," Ex. 21 at 65;

- the student government discussing a bill allowing student organizations to limit group leadership based on "the group's beliefs and standards," which was interpreted as "discrimination against the LGBT community," Ex. 21 at 97; and

- a video of an incoming student "sharing and stating hateful speech" about the use of preferred pronouns, Ex. 21 at 87.

A professor was also reported to the CCRS for not correcting a student who described abortion and birth control as "women's issues." Ex. 22 at 1-2.

The CCRS "responds to every reported incident of bias." Ex. 23 at 17. "Responses are determined on a case-by-case basis," and "[e]very effort will be made to respect the claimant's decision about how to proceed after filing a report." Exs. 15 at 2; 13 at 3. When the CCRS receives a report, it "assesses the incident, determines the appropriate lead(s) to handle the response and communicates next steps." Ex. 15 at 1. It implores students to "not try to investigate to determine [whether] the ... incident took place" because a "partner ... will determine the proper next steps and authenticity of the information." Ex. 13 at 3. The CCRS then "outreaches to the reporter within two business days." Ex. 23 at 17. While "[a] lot of times, [the CCRS's] outreach is for people who want to be heard," an assistant vice president explained, "sometimes it needs more corrective steps, and sometimes we realize this really is an [Office of Equal Opportunity] issue that rises to the level of investigation." Ex. 15 at 1.

In 2018, the CCRS took steps beyond initial outreach in 56.4% of reported cases, including "meeting with individual(s) identified as committing the bias to discuss impact and institutional values." Ex. 23 at 17. The CCRS engages in "constructive dialogue" with individuals accused of committing bias incidents, and "[r]eports through the website are referred to the appropriate partner who will determine what, if any, next steps will be taken by their administrative unit." Exs. 23 at 4; 22 at 2. When those next steps include contacting the student who allegedly perpetrated a "bias incident," that student must comply with the official's directive. "Failure to comply with the directive of authorized university officials or police officers" and "[f]ailure to appear before any university ... regulatory body as summoned" constitute "contempt" under the University's disciplinary rules. Ex. 26, §4.2.14. According to the CCRS's reporting website, "[i]f the decision is made to pursue disciplinary action against the person who engaged in the conduct, certain information related to the report will be shared with that person" and "[w]itnesses may also be made aware of certain information." Ex. 13 at 3.

## II.     Speech First and This Litigation

Plaintiff Speech First is a nationwide membership organization dedicated to preserving civil rights secured by law, including the freedom of speech. Neily Decl. ¶2. In particular, Speech First seeks to protect the rights of students and others at colleges and universities through litigation and other lawful means. ¶2.

Speech First has several members who are current students at the University, including Students A, B, and C. ¶¶3-5. Speech First's members want to chalk messages on the University's sidewalks, as they have done in the past; but they refrain because their messages are prohibited by the University's chalking policy. ¶¶11-12. Speech First's members also want to send emails from their University accounts, as well as their personal accounts while on the University's network, supporting their preferred candidates and ballot issues; but they refrain because section 4.5.7 of the acceptable

use policy prohibits such messages. ¶¶13-14. Further, Speech First's members hold views that are deeply controversial on campus—for example, advocating for the construction of a border wall, opposing abortion, and supporting President Trump's reelection. ¶8. They are aware of the University's policy on "bias incidents" and credibly fear that expressing their views will get them reported to the CCRS, tracked by the University, and referred for investigation or punishment. ¶¶8-10.

## ARGUMENT

Speech First's right to a preliminary injunction turns on "(1) the threat of irreparable harm to [its members]; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that [Speech First] would succeed on the merits; and (4) the effect on the public interest." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 870 (8th Cir. 2012) (en banc). In a First Amendment case, the third factor is decisive. "Generally, if a party shows a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are deemed to have been satisfied." *Rodgers v. Bryant*, 942 F.3d 451, 456 (8th Cir. 2019) (cleaned up). Speech First is likely to prevail on the merits and satisfies the remaining criteria.

## I.      Speech First is likely to prevail on the merits.

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). The First Amendment's importance is at its apex at colleges and universities. *See Healy*, 408 U.S. at 180; *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989). "[S]tudents must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. N.H. ex rel. Wyman*, 354 U.S. 234, 250 (1957). The First Amendment's protections are "not confined to the supervised and ordained

discussion which takes place in the classroom" but extend throughout a university's campus. *Solid Rock*, 478 F. Supp. at 102.

Put simply, "First Amendment protections [do not] apply with less force on college campuses than in the community at large." *Healy*, 408 U.S. at 180; *accord James v. Nelson*, 349 F. Supp. 1061, 1063 (N.D. Ill. 1972). "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus" thus "may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973). After all, "[t]he college campus is peculiarly suited to serve as a marketplace of ideas and a forum for the robust exchange of different viewpoints." *Solid Rock*, 478 F. Supp. at 102.

### A.      The chalking policy violates the First Amendment.

The University's prohibition on chalking violates the First Amendment. Both by "long tradition" and by "government fiat," *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983), the University's outdoor areas, including its sidewalks, are a traditional public forum. *See* Iowa Code Ann. §261H.4(1). Content-based restrictions on speech in a traditional public forum "must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

The chalking policy is content-based. It "'on its face' draws distinctions based on the message a speaker conveys," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)—allowing speech about certain organizational events and forbidding speech on any other topic. Such content-based restrictions pose "substantial and expansive threats to free expression" and are "presumptively invalid." *United States v. Alvarez*, 567 U.S. 709, 717 (2012); *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). The chalking policy is also speaker-based, as it prohibits speech by anyone other than registered student organizations. "Speech restrictions based on the identity of the speaker are all too often simply a means to control content" and are equally "[p]rohibited." *Citizens United*, 558

U.S. at 340. The Supreme Court is "deeply skeptical" of "[s]peaker-based laws" because they "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *NIFLA v. Becerra*, 138 S. Ct. 2361, 2378 (2018).

The chalking policy cannot survive strict scrutiny. It cannot possibly further a compelling state interest because it violates Iowa law, which (with inapplicable exceptions) prohibits restrictions on students' "noncommercial expressive activity in outdoor areas of campus." Iowa Code Ann. §261H.3(2). Nor could the chalking policy be narrowly tailored. The University's speaker-based distinction is arbitrary: the chalking policy does not meaningfully limit the *amount* of chalking (nothing limits the number of events that student organizations can hold, or the amount of times they can publicize an event in chalk) or the *nature* of chalking (student organizations can name events whatever they want). And the policy's prohibition on "eras[ing], remov[ing], effac[ing], writ[ing] over, modify[ing], or otherwise impair[ing] the legibility of any chalking" is sufficient, on its own, to address any other interest the University might have in regulating chalking. Norris Decl., Ex. 1, §B.

### B.    The political-emails policy violates the First Amendment.

Section 4.5.7 of the acceptable use policy, banning emails that support candidates or ballot issues, also violates the First Amendment. The University's email accounts and internet networks are traditional public forums, at least for students. *See Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 864 (3d Cir. 1984) (explaining that aspects of a college campus can be a traditional public forum for students, even if it's not for outsiders); *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (explaining that the internet is today's quintessential traditional public forum). Students can and do use these resources for personal and political speech. Again, content-based restrictions on speech in a traditional public forum must satisfy strict scrutiny. *Summum*, 555 U.S. at 469. And, in any forum, "viewpoint discrimination" is "forbidd[en]." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Section 4.5.7 discriminates on the basis of content and viewpoint. It is content-based because it is "targeted at specific subject matter," *Reed*, 135 S. Ct. at 2230—namely, speech about candidates or ballot measures. It also "discriminate[s] among viewpoints within that subject matter." *Id.* Section 4.5.7 prohibits emails that "support" candidates or ballot measures, but not emails that *oppose* candidates or ballot measures. Thus, a student who emails "Vote Bernie" will face discipline by the University, while a student who emails "Don't Vote Bernie" will not. "When the government targets … particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829.

Section 4.5.7 cannot satisfy strict scrutiny. The University has no justification for adopting a viewpoint-discriminatory, rather than a viewpoint-neutral, policy. *See R.A.V.*, 505 U.S. at 395-96. Nor can the University explain why it forbids emails, but allows students to support candidates and ballot issues via other means (both electronic and nonelectronic) and allows students to use email to support political causes not tied to an election. "Precision must be the touchstone when it comes to regulations of speech, which so closely touch our most precious freedoms." *NIFLA*, 138 S. Ct. at 2376 (cleaned up).

### C.     The bias-incidents policy violates the First and Fourteenth Amendments.

The University's policy on "bias incidents," as enforced by the CCRS, is unconstitutional for two main reasons. It is overbroad and vague, in violation of the First and Fourteenth Amendments.

The bias-incidents policy is overbroad. "Because First Amendment freedoms need breathing space to survive, a state may regulate in the area only with narrow specificity." *Gooding v. Wilson*, 405 U.S. 518, 522 (1972). "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional." *United States v. Stevens*, 559 U.S. 460, 473 (2010). Overbroad regulations are facially unconstitutional because "the threat of enforcement … may deter or 'chill' constitutionally protected speech," as "[m]any persons, rather than undertake the considerable burden

(and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech, harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

The University's definition of "bias incident" is grossly overbroad. The University admits that it covers speech, including "verbal harassment," "jokes," and use of a "digital platform." Ex. 13 at 2; Ex. 23 at 13. And the vast majority of bias incidents reported to the CCRS involve speech. *See* Ex. 21. Thus, the bias-incidents policy ropes in wide swaths of protected speech. The "idea" that "[t]he Government has an interest in preventing speech expressing ideas that offend … strikes at the heart of the First Amendment." *Matal v. Tam*, 137 S. Ct. 1744, 1764 (2017). "[T]he point of all speech protection ... is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995). By focusing on "bias-motivated" speech, the bias-incidents policy is also viewpoint discriminatory. *R.A.V.*, 505 U.S. at 392. This viewpoint discrimination "end[s] the matter" in terms of the policy's overbreadth. *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

The bias-incidents policy is also void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[T]he vagueness doctrine has two primary goals: (1) to ensure fair notice to the citizenry and (2) to provide standards for enforcement [by officials]." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 551 (6th Cir. 2007). "With respect to the first goal, … '[a] statute which either forbids or requires the doing of an act in terms so vague that [individuals] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1925)). "With respect to the second goal, … 'if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates

basic policy matters to [officials] for resolution on an ad hoc and subjective basis.'" *Id.* (quoting *Grayned*, 408 U.S. at 108-09). These principles are especially demanding when First Amendment freedoms are at stake. If the challenged law "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *accord Scull v. Va. ex rel. Comm. on Law Reform & Racial Activities*, 359 U.S. 344, 353 (1959).

The University's definition of "bias incident" is amorphous and entirely subjective, using undefined terms like "demeaning" and turning on what the listener "perceives." Norris Decl., Exs. 13 at 2; 23 at 18. The First Amendment requires clarity, precision, and objectivity when public universities regulate speech. *See Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1184 (6th Cir. 1995); *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 250-51 (3d Cir. 2010); *DeJohn v. Temple Univ.*, 537 F.3d 301, 317-18 (3d Cir. 2008). The absence of a clear standard creates a serious risk that this policy will be enforced in an arbitrary or discriminatory manner, or will be used to target speech based on the viewpoint expressed. *See Coates v. City of Cincinnati*, 402 U.S. 611, 614-15 (1971). The University's policy on bias incidents is thus void for vagueness.

## II. Speech First satisfies the remaining preliminary-injunction criteria.

"When a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Minn. Citizens*, 692 F.3d at 870. Because Speech First is likely to prevail on its First Amendment claims, the Court should enter a preliminary injunction. In any event, Speech First independently satisfies the equitable criteria for a preliminary injunction.

First, Speech First will suffer irreparable harm without interim relief. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *accord Johnson v. Minneapolis Park & Recreation Bd.*, 729

F.3d 1094, 1101 (8th Cir. 2013); *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008); *Bus. Leaders in Christ v. Univ. of Iowa*, 360 F. Supp. 3d 885, 905 (S.D. Iowa 2019) (Rose, J.); *InterVarsity Christian Fellowship/USA v. Univ. of Iowa*, 2019 WL 5059854, at *20 (S.D. Iowa 2019) (Rose, J.). "If [a plaintiff] can establish a substantial likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007).

Second, the balance of harms overwhelmingly favors a preliminary injunction. A "likely First Amendment violation ... means that the public interest and the balance of harms (including irreparable harm to [the plaintiff]) favor granting the injunction." *Child Evangelism Fellowship of Minn. v. Minneapolis Special Sch. Dist. No. 1*, 690 F.3d 996, 1004 (8th Cir. 2012). Speech First's members have a powerful interest in conducting open and vigorous discourse at the University without threats of investigation or punishment. In contrast, the University has no interest in chilling speech protected by the First Amendment, even if it perceives such speech as "particularly hurtful to many." *Snyder*, 562 U.S. at 456. Further, after Speech First receives a preliminary injunction, the University remains "free to enact new regulations that are tailored so as to conform to First Amendment jurisprudence." *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 373 (M.D. Pa. 2003).

Third, a preliminary injunction is in the public interest because "the public interest favors protecting core First Amendment freedoms." *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999). As the Eighth Circuit has explained, "it is always in the public interest to protect constitutional rights." *Phelps-Roper*, 509 F.3d at 485. Indeed, this Court has recognized that "it is axiomatic that protection of First Amendment rights serves the public interest." *Gerlich v. Leath*, 152 F. Supp. 3d 1152, 1181 (S.D. Iowa 2016), *aff'd*, 861 F.3d 697 (8th Cir. 2017); *accord Bus. Leaders in Christ*, 360 F. Supp. 3d at 905. The public undoubtedly has a strong interest in ensuring the protection of speech and expression at public universities. After all, the First Amendment echoes "a profound

national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

## CONCLUSION

This Court should grant Speech First's motion and preliminarily enjoin Defendants, during the pendency of this litigation, from enforcing the University's chalking policy, enforcing section 4.5.7 of the University's acceptable use policy, or using the CCRS (or any of its University partners) to investigate, threaten, refer, or punish students (including informal punishments) for bias incidents.

Respectfully submitted,

Dated: January 6, 2020

Skylar J. Limkemann, AT0012324
SMITH MILLS SCHROCK BLADES PC
118 3rd Ave. SE, Suite 200
P.O. Box 36
Cedar Rapids, IA 52406-0036
(319) 286-1743
(319) 286-1748 (fax)
SLimkemann@smithmillslaw.com

 /s/ *Thomas R. McCarthy*

Thomas R. McCarthy (pro hac vice pending)
    *Lead Counsel*
J. Michael Connolly
Cameron T. Norris (pro hac vice pending)
Tiffany H. Bates
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com