# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| SPEECH FIRST, INC., | Case No. 4:20-CV-2-SMR-SBJ |
| Plaintiff, | |
| v. | **Oral Argument Requested** |
| WENDY WINTERSTEEN, in her official capacity as President of Iowa State University of Science and Technology, | |
| Defendant. | |

## DEFENDANT WENDY WINTERSTEEN'S RESISTANCE TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Matthew D. Callanan
BELIN McCORMICK, P.C.
666 Walnut Street, Suite 2000
Des Moines, IA 50309-3989
Telephone: (515) 283-4610
Facsimile: (515) 558-0610
mdcallanan@belinmccormick.com

Ishan K. Bhabha (*pro hac vice*)
Lauren J. Hartz (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile: (202) 639-6066
ibhabha@jenner.com
lhartz@jenner.com

*Counsel for Defendant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INDEX OF SUPPORTING MATERIALS ...................................................................iv

INTRODUCTION...............................................................................................................1

BACKGROUND.................................................................................................................3

     A.      Freedom Of Expression At Iowa State University ................................................3

     B.      Chalking On Campus .........................................................................................7

     C.      Acceptable Use Of University Email .................................................................8

     D.      Campus Climate Reporting System....................................................................9

ARGUMENT ....................................................................................................................13

I.      Plaintiff Is Unlikely To Prevail On The Merits ............................................................14

     A.      Plaintiff's Claims Challenging Eliminated Policies Are Moot ...........................14

     B.      Plaintiff's Challenges To CCRS Are Not Likely To Succeed ...........................16

           i.      Plaintiff does not have standing to challenge CCRS ..............................16

           ii.     Plaintiff would not prevail on the merits even if it had standing.............22

II.     Additional Factors Weigh Against A Preliminary Injunction..........................................22

CONCLUSION..................................................................................................................24

# TABLE OF AUTHORITIES

CASES

*Abbott v. Pastides*, 900 F.3d 160 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1292 (2019) ............................................................................................................17, 19

*American Future Systems, Inc. v. Pennsylvania State University*, 752 F.2d 854 (3d Cir. 1984) ............................................................................................................ 24

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) .............................. 18

*Benisek v. Lamone*, 138 S. Ct. 1942 (2018) .......................................................................... 23

*Beta Upsilon Chi Upsilon Chapter at the University of Florida v. Machen*, 586 F.3d 908 (11th Cir. 2009) ............................................................................................ 15

*Brandt v. Board of Education of City of Chicago*, 480 F.3d 460 (7th Cir. 2007) ................. 24

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................................ 23

*D.M. by Bao Xiong v. Minnesota State High School League*, 917 F.3d 994 (8th Cir. 2019) ............................................................................................................ 22

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ......................................................... 17

*Doe v. Nixon*, 716 F.3d 1041 (8th Cir. 2013) ...................................................................... 14

*Gomez v. Allbee*, 134 F. Supp. 3d 1159 (S.D. Iowa 2015) ....................................... 13, 22, 24

*Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 479 F. Supp. 2d 968 (N.D. Iowa 2007) ............................................................................................................ 23

*International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986) ........................................................ 16

*Iowa Right To Life Committee, Inc. v. Tooker*, 717 F.3d 576 (8th Cir. 2013) .................17, 18

*Laird v. Tatum*, 408 U.S. 1 (1972) .................................................................... 17, 19, 20, 21

*Libertarian Party of Arkansas v. Martin*, 876 F.3d 948 (8th Cir. 2017) .............................. 15

*Lujan v. Defenders of Wildlife (Lujan II)*, 504 U.S. 555 (1992) .......................................... 17

*Lujan v. National Wildlife Federation (Lujan I)*, 497 U.S. 871 (1990) ............................... 17

*Management Registry, Inc. v. A.W. Companies, Inc.*, 920 F.3d 1181 (8th Cir. 2019) ............................................................................................................ 13

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ...................................................................... 13

*McCarthy v. Ozark School District*, 359 F.3d 1029 (8th Cir. 2004) .................................... 14

*Meese v. Keene*, 481 U.S. 465 (1987) ................................................................................ 22

*Missouri Protection & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803 (8th Cir. 2007) ............................................................................................................................ 15

*Moore v. Thurston*, 928 F.3d 753 (8th Cir. 2019) ............................................................... 14

*Munaf v. Geren*, 553 U.S. 674 (2008) ................................................................................ 13

*Republican Party of Minnesota, Third Congressional District v. Klobuchar*, 381 F.3d 785 (8th Cir. 2004) ............................................................................................... 17

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 School District*, 696 F.3d 771 (8th Cir. 2012) .............................................................................................................................. 23

*Scott v. Benson*, 863 F. Supp. 2d 836 (N.D. Iowa 2012) .............................................. 13, 23

*Speech First v. Fenves*, 384 F. Supp. 3d 732 (W.D. Tex. 2019), *appeal docketed*, No. 19-50529 (5th Cir. June 7, 2019) ........................................................................... 19-20

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (6th Cir. 2019) ........................................ 16, 21

*Stevenson v. Blytheville School District #5*, 800 F.3d 955 (8th Cir. 2015) ...................... 14-15

*Stowers v. Donahoe*, No. 4:11-CV-112,  2011  WL 13308322  (S.D. Iowa June 21, 2011) ............................................................................................................................. 13

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ............................................. 16, 17

*Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013) ................................................................ 14

*Turning Point USA at Arkansas State University v. Rhodes*, 409 F. Supp. 3d 677 (E.D. Ark. 2019), *appeal docketed*, No. 19-3016 (8th Cir. Sept. 18, 2019) ................... 15

*Watkins Inc. v. Lewis*, 346 F.3d 841 (8th Cir. 2003) ........................................................... 13

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008) ............................... 13

## OTHER AUTHORITIES

Order, *Speech First v. Killeen*, No. 3:19-CV-3142  (C.D. Ill.  Sept. 17, 2019), ECF No. 23, *appeal docketed*, No. 19-2807 (7th Cir. Sept. 19, 2019) ............................. 16, 20

## INDEX OF SUPPORTING MATERIALS

Declaration of Vernon Hurte, Former Associate Vice President for Student Affairs and the Dean of Students ("Hurte Decl.")

Exhibit A: Excerpt from the Student Disciplinary Regulations (Code of Conduct)

Exhibit B: Iowa State University Principles of Community

Exhibit C: Iowa State University's Facilities and Grounds Use Policy

Exhibit D: Students Against Racism Demands and University Response

Exhibit E: "Trump to visit ISU Tuesday, Teases Guest and 'Special Announcement,'" by Alex Hanson (Jan. 17, 2016)

Exhibit F: "Iowa Governor Speaks at Young Women's Camp," by Maggie Curry (July 12, 2017)

Exhibit G: "Minnesota Sen. Klobuchar to Speak at Iowa State," by Austin Cannon (July 24, 2017)

Exhibit H: Facebook Event of Paul Pate for Iowa with Iowa State University College Republicans

Exhibit I: "Bernie Sanders Campaigns for Scholten, DeJear at ISU Rally," by Matt Tibesar (Oct. 22, 2018)

Exhibit J: Student Meet & Greet with Pete Buttigieg, hosted by Iowa State University College Democrats

Exhibit K: Kim Reynolds Event with Iowa State University College Republicans

Exhibit L: "Bernie Sanders to Return to Iowa State," by Logan Engle (Sept. 5, 2019)

Exhibit M: Bret Richards for Congress Event with Iowa State University College Republicans

Exhibit N: "Biden's Visit to Be on Wednesday at ISU Memorial Union," by Robbie Sequeira (Dec. 2, 2019)

Declaration of Reginald Stewart, Vice President for Diversity and Inclusion ("Stewart Decl.")

Exhibit A: Campus Climate Reporting System Website (last visited Feb. 24, 2020)

Exhibit B: Students Against Racism Demands and University Response

Exhibit C: "Iowa State Students Call out Administrators as Investigations into Racism Accumulate," The Gazette (Nov. 21, 2019)

Exhibit D: "StuGov Passes Bill Censuring Department of Residence for Recent Events," by Cassie Lehmann (Nov. 7, 2019)

Exhibit E: "Student Stages Walk Out Ahead of Leath Address During ISCORE," by Jacey Goetzman (Mar. 3, 2017)

Exhibit F: "Student Government Censures College of Veterinary Medicine Administration," by Cassie Lehmann (Feb. 12, 2020)

Declaration of Sara Kellogg, Assistant Dean and Director of the Office of Student Conduct ("Kellogg Decl.")

Declaration of Steve Winfrey, Director of the Memorial Union ("Winfrey Decl.")

Exhibit A: Student Organization Recognition Policy

Exhibit B: "Letter: Randy Feenstra's Qualities Can Beat Steve King," by Charles Klapatauskas (Dec. 8, 2019)

Exhibit C: "Opposing Chalk Messages Spread Abortion Debate on Campus," by Loretta McGraw (Oct. 12, 2019)

Exhibit D: "Bahr: New York Times Article on Kavanaugh Spreads Misinformation," by Connor Bahr (Sept. 23, 2019)

Exhibit E: "Rochford: It's OK to be a Conservative," by John Rochford (June 25, 2019)

Exhibit F: "Letter: Abortion vs. Science," by Luke Barnes (Apr. 22, 2019)

Exhibit G: "Letter: Daily Editorial on Gun Violence Lack Due Diligence," by Jacob Zirkelbach (Mar. 31, 2019)

Exhibit H: "Letter: Gun Rights and Gun Violence: A Response to the ISD Editorial Board," by John Rochford (Mar. 31, 2019)

Exhibit I: "Letter: Fuentes Should Not Have Been Ignored," by Ben Whittington (Mar. 9, 2019)

Exhibit J: "Trump Highlights Two Sides of the Nation During State of the Union Address," by Eli Harris (Feb. 6, 2019)

Exhibit K: "Students Weigh In on Election Issues, Explain what Drives Them to the Polls," by Talon Delaney (Nov. 5, 2018)

Exhibit L: "Letter: ISU College Republicans Response to Letter About Communism," by the ISU College Republicans (Apr. 21, 2018)

Exhibit M: "State of the Union Draws Mixed Reactions," by Chris Anderson (Feb. 1, 2018)

Exhibit N: "Caucus to Convention Kickoff," hosted by the College Republicans on January 25, 2020

Exhibit O: Tabling set up outside the ISU Hub, hosted by Cyclones for Yang, an ISU student group supporting Andrew Yang for President on November 4, 2019

Exhibit P: Movie screening of "Unplanned!" hosted by the Catholic Student Community on October 15, 2019

Exhibit Q: Outdoor tabling event hosted by Students for Life on October 4, 2019

Exhibit R: Tables supporting President Trump outside the ISU Library and Curtis Hall on September 24, September 30, October 4, October 9, October 15, October 23, October 31, and December 3, 2019

Exhibit S: Table supporting Joni Ernst set up outside Curtis Hall on October 17, 2019

Exhibit T: "2020 Presidential Caucus Fair," hosted by the College Democrats on October 2, 2019

Exhibit U: Speech by Dane Johnson, spokesperson for Trump Victory Iowa on October 2, 2019

Exhibit V: "Welcome Week," hosted by Campus Christian Fellowship from August 25 to August 30, 2019

Exhibit W: "Senior Night," hosted by the Campus Christian Fellowship on March 12, 2019

Exhibit X: "Spring Kickoff" party hosted by the College Democrats on January 28, 2019

Exhibit Y: "Central Iowa Leadership Workshop" for pro-life groups, hosted by Students for Life on November 3, 2018

Exhibit Z: Table on campus promoting reelection of Representative Steve King, hosted by the College Republicans on November 2, 2018

Exhibit AA: "Fetal Pain Tour," hosted by Students for Life inside the Memorial Union on October 30, 2018

Exhibit BB: "Candidate Dinner," featuring Congressman Steve King, Secretary of Agriculture Mike Niag, and Republican candidate Jeremy Davis, hosted by the College Republicans on October 24, 2018

Exhibit CC: Discussion with Jeremy Davis, a conservative candidate for State Treasurer, hosted by the College Republicans on September 19, 2018

Exhibit DD: Speech by Joe Walsh, conservative talk radio host, hosted by Turning Point USA and the College Republicans on October 18, 2017

Exhibit EE: "Why Intelligent Design Is Not Science," hosted by the Atheist and Agnostic Society on September 26, 2017

Exhibit FF: "Capitalism vs Socialism Debate," hosted by Turning Point USA on April 18, 2017

Exhibit GG: "First Amendment Days," hosted by the Greenlee School of Journalism at ISU on April 20, 2017

Exhibit HH: Movie screening of "Hush," an informational movie about abortion, hosted by Students for Life on March 23, 2017

Exhibit II: "A Night with an Atheist Voter," hosted by the Atheist and Agnostic Society on October 26, 2016

Exhibit JJ: "Presidential Debate Watch Party," hosted by College Republicans on September 26, 2016

Exhibit KK: Movie screening of "3801 Lancaster: American Tragedy," hosted by Students for Life on February 17, 2016

Declaration of Michael Newton, Associate Vice President and Chief of Police for the Iowa State University Department of Public Safety ("Newton Decl.")

Declaration of Virginia Speight, Associate Director for Residence Life ("Speight Decl.")

Declaration of Jacob Schrader, current Iowa State University student ("Schrader Decl.")

Exhibit A: "StuGov Senators Voted for a Bill Without Knowing Consequences," by Devyn Leeson (Feb. 25, 2019)

Exhibit B: "Iowa Signs Campus Religious Liberty, Free Speech Bill into Law," The Family Leader

Exhibit C: "Iowa State Student Gov Sponsors 'Tree of Oppression,'" Campus Reform (July 6, 2018)

Exhibit D: "Letter to the Editor: Daily Article 'Survivors Unite at Anti-Kavanaugh Rally' Shows Bias," by Jacob Schrader (Oct. 6, 2018)

Exhibit E: "Letter: I Trust Chris Nelson to Ensure Ames Residents' Benefits," by Jacob Schrader (Dec. 1, 2019)

Exhibit F: "Letter: Let the System Work," by Jacob Schrader (Jan. 31, 2018)

Declaration of Sheryl Rippke, Policy Administrator ("Rippke Decl.")

Exhibit A: Chalking Policy Development Plan

Exhibit B: Chalking Policy Approval and Text

Exhibit C: Acceptable Use Policy Development Plan

Exhibit D: Acceptable Use Policy Approval and Text

Declaration of Michael Lohrbach, Director of Enterprise Services and Customer Success ("Lohrbach Decl.")

Declaration of Margo Foreman, Assistant Vice President for Diversity and Inclusion and Director of Equal Opportunity ("Foreman Decl.")

Exhibit A: Iowa State University's Discrimination and Harassment Policy

## INTRODUCTION

Free speech and open debate are central to the identity and operation of Iowa State University ("ISU" or the "University"). ISU has built and maintained a community where over 32,000 students express themselves freely no matter what the subject or viewpoint—both within and outside the classroom, and as members of over 900 different student organizations. As the University emphasizes to all new students, ISU "cannot restrict speech, or punish a speaker, even when we disagree with what is being said, or are offended by the ideas or the viewpoint." When students encounter speech they find disagreeable or offensive, ISU urges them to "listen, and strive for understanding, even where agreement is not possible."

Plaintiff Speech First, Inc., a national advocacy organization, nonetheless claims that ISU has "created a series of rules and regulations designed to restrain, deter, suppress, and punish speech concerning political and social issues of public concern." Relying on boilerplate allegations recycled from prior actions against other universities, Plaintiff misstates and mischaracterizes ISU's policies and practices. And, in the sole witness statement it submits in support of its motion—a three-page declaration not from any current or former ISU student but from the president of its Washington, D.C.-based advocacy organization—Plaintiff fails to present anything close to competent evidence that ISU punishes or deters the "deeply controversial" views its three unnamed members allegedly wish to express. Indeed, as the substantial record of evidence provided by the University demonstrates, students routinely express those views in myriad ways, including through organizations, events, invited speakers, and publications. Plaintiff's hearsay allegations about the alleged chilling effect of certain policies, when measured against the robust record of free expression across ISU, provide no basis for the extraordinary relief Plaintiff seeks.

*First*, the majority of Plaintiff's claims are moot. Plaintiff challenges an "interim chalking policy" that, as the name suggests, was a placeholder pending ISU's adoption of a permanent policy.   That permanent policy has now gone into effect, following ISU's formal policy promulgation process.  The permanent policy eliminates the restrictions upon which Plaintiff's first claim was predicated.  That claim is moot.

*Second*, ISU has eliminated the challenged subsection of its policy on acceptable email use, a subsection that was inconsistent with University practice and was never enforced.  As previously drafted, that policy indicated no one (including students) could use an ISU email account to solicit support for a candidate or ballot measure.  After Plaintiff filed suit, the policy was amended to accord with state law prohibiting only state employees from using their state/University email accounts in that manner.  Plaintiff's second claim is thus also moot.

*Third*, Plaintiff lacks standing to challenge the Campus Climate Reporting System ("CCRS"), which gathers reports and disseminates information about issues of concern within the ISU community.  Relying upon anonymous allegations about a different and defunct program, the Campus Climate Reporting Team ("CCRT"), Plaintiff claims the existence of CCRS deters its members from expressing "controversial" views out of fear they will be contacted, investigated, or punished.  Plaintiff fails to present any evidence whatsoever that CCRS ever has, or ever could, burden freedom of expression in any of those ways.  As ISU administrators explain, not only does CCRS purposefully lack any ability to punish students based on their speech (or any other grounds), but the speech Plaintiff's members wish to express does not violate any provision of the Student Code of Conduct and thus cannot not form the basis for punishment of any sort by any official.  Indeed, Jacob Schrader, a self-identified conservative student who was the subject of a report highlighted by Plaintiff, has submitted a declaration attesting that he did not even *know* of

the report until he read the Complaint, and that he frequently expresses many of the same views Plaintiff's members (none of whom has provided a sworn statement) claim they are chilled from expressing by ISU's policies.

Plaintiff's motion for a preliminary injunction should be denied.

## BACKGROUND

### A.    Freedom Of Expression At Iowa State University

The Student Code of Conduct ("Student Code") announces ISU's commitment to free expression on its very first page: "As an educational institution, the university recognizes that the transmission of knowledge, the pursuit of truth, and the development of individuals require the free exchange of ideas, self-expression, and the challenging of beliefs and customs." Hurte Decl. ¶ 4. The Student Code does not contain a *single* provision penalizing students for protected speech, and Plaintiff identifies none. *Id*. ¶ 16.   In fact, the University's Principles of Community emphasize "the right to and importance of a free exchange of ideas at Iowa State University."   *Id*. ¶ 5 & Ex. B.   The University "increase[s] the diversity of ideas, cultures and experiences throughout the university community … through education and constructive strategies to consider and engage in honest disagreements."  Hurte Decl. Ex. B.

Indeed, ISU has remained steadfast in its protection of First Amendment rights even in the face of concerted pressure to punish or prohibit certain viewpoints.  For example, a group called "Students Against Racism" demanded that ISU ban expression of racist or anti-Semitic viewpoints. Hurte Decl. ¶ 7; *see also* Stewart Decl. ¶ 11 (identifying additional examples of such criticism). In response, ISU affirmed its unyielding commitment to all forms of protected expression, noting it "cannot impose restrictions or punish individuals based upon the content of a person's speech" and "cannot punish individuals for having bigoted or hateful thoughts or even expressing bigoted

3

thoughts or hate speech."  Hurte Decl. ¶ 8(a)-(b).  The University conveys this same message to all of its new students during orientation:

> We have a legal obligation, and as one of our core values, the responsibility to protect and promote free expression on our campus. Because of this, the university cannot restrict speech, or punish a speaker, even when we disagree with what is being said, or are offended by the ideas or the viewpoint of the person, or groups speaking.

*Id.* ¶ 9.  Similarly, ISU trains its faculty and staff "to emphasize that rude or disrespectful language, or language that expresses political or ideological views that many may find offensive does not violate the Student Code."  Kellogg Decl. ¶ 13.

Consistent with its commitment to diverse viewpoints, ISU hosts a lecture series "designed to bring new ideas to campus and encourage students to become familiar with viewpoints that are different from their own."  Hurte Decl. ¶ 10.  Numerous lectures have addressed the importance of free speech on campus, including "Talk Is Cheap, Free Speech Isn't: Why the First Amendment is Worth It," and "Stand Up! Speak Up! Youth & the First Amendment," and "Hate: Why We Should Resist It with Free Speech, Not Censorship."  *Id.* ¶ 10(d), (f), (i).  The University also organizes events with political candidates across all parties and levels of government.  *Id.* ¶ 11.  For example, ISU has welcomed President Donald Trump, Governor Kim Reynolds, and Senators Rand Paul, Rick Santorum, Joni Ernst, and Chuck Grassley in the last few years, and has hosted presidential candidates Elizabeth Warren, Pete Buttigieg, and Marianne Williamson so far in this cycle.  *Id.* ¶ 11.

In addition, ISU boasts over 900 recognized student organizations, spanning the ideological spectrum.  Winfrey Decl. ¶ 5.  Among the student organizations active in recent years are several groups that advocate for the views Plaintiff's anonymous members apparently wish to express—including the College Republicans, Students for Concealed Carry on Campus, Students for Life,

Students for Open Discussion, The Navigators, Turning Point USA, and Young Americans for Freedom. *Id.* ¶ 8. These groups, like all recognized student organizations, have enjoyed access to space, funding, and other ISU resources as they engage in programming and events to promote their message. *Id.* ¶¶ 6-7. ISU has provided financial and logistical support for events such as "Christian Worldview Panel Discussion," "Capitalism vs. Socialism Debate," "Get to Know the NRA," "Fetal Pain Tour," and "Faith, Academia, and Politics Discussion." *Id.* ¶ 11. ISU also provides enhanced security free of charge to ensure events can proceed without disruption. Newton Decl. ¶¶ 11-12. Recent talks benefiting from free ISU security include "nationalist media personality" Nick Fuentes, conservative talk radio host Joe Walsh, and Republican Senator Joni Ernst. *Id.* ¶ 12(d)-(f).

Beyond events and speakers, students have several other means to express their diverse views on campus. For example, student organizations can reserve a table or booth within the Memorial Union—the central campus hub—where they can promote their messages through flyers and display cases. Winfrey Decl. ¶ 12. Students also express their views in the Iowa State Daily on topics including abortion, gun rights, President Trump, and more. *Id.* ¶ 10. More generally, ISU "embraces the sharing of knowledge and ideas through public discourse and free speech," and permits students to "protest, carry signs, erect displays, pass out leaflets, and engage in dialogue anywhere on the unrestricted outdoor areas of campus." Hurte Decl. ¶ 6 & Ex. C. In ISU residence halls, students are free to post any material within their rooms or on the whiteboards affixed to their doors. Speight Decl. ¶¶ 9-10. Students may also use residence hall community spaces to host events and engage their peers in discussion. *Id.* ¶ 11.

The University embraces and facilitates all of this expression, including speech on the very topics Plaintiff's anonymous members claim they want to address. Hurte Decl. ¶¶ 15-16. As

former Dean of Students Vernon Hurte explained: "a student expressing views on any of these topics has not, and would not, face any disciplinary consequence." *Id*. ¶ 16. Such expression does not violate any provision of the Student Code and to the contrary "is protected by the First Amendment, to which the University strictly adheres." *Id*.; *see also* Kellogg Decl. ¶ 11 ("Expressing those views would not violate any provision of the Student Code. As such, the anonymous students could not be disciplined in any way for expressing these views."). Chief of ISU Department of Public Safety ("DPS") Michael Newton likewise confirmed: "[P]rotecting the ability of all members of the campus community to freely and openly express their ideas is—after of course ensuring campus safety—one of the most important objectives of the ISU DPS. It is a role my officers and myself take very seriously, and the notion that we 'investigate' or otherwise penalize the free expression of views is categorically false." Newton Decl. ¶ 13.

The lived experience of a current junior, Jacob Schrader, exemplifies ISU's commitment to free expression. As Mr. Schrader explained, "I identify as politically conservative and a Christian, and I participate in numerous events on campus to express my views to my fellow students and the broader University community." Schrader Decl. ¶ 1. Mr. Schrader's views "overlap with some of the views apparently held by the three anonymous students identified in the Complaint," and on these very topics Mr. Schrader can, and has, expressed himself "freely and without repercussions from the University." *Id*. ¶ 4. For example, he frequently attends events on campus hosted by Americans for Prosperity; engages classmates in conversations about Jesus Christ; and uses campus bulletin boards to advertise The Navigators, a collegiate Christian Fellowship. *Id*. ¶ 4(b)-(c). He also speaks with various media outlets about his views and writes letters to the editor criticizing the reporting and editorials of the Iowa State Daily on subjects ranging from the nomination of Justice Kavanaugh to student government bills protecting religious

groups' membership policies.  *Id*. ¶ 4(d)-(f) & Exs. D-F.  As Mr. Schrader attested, "I feel free to express my opinions at ISU and have ample opportunity to do so."  *Id*. ¶ 5.

      **B.**      **Chalking On Campus**

      Chalking messages on campus sidewalks is another means of student expression.  Before November 6, 2019, "there were essentially no restrictions on where students could chalk on campus."  Hurte Decl. ¶ 20; *see also* Rippke Decl. ¶ 19.  "[A]lmost the entire campus was covered in chalked messages," leading to numerous complaints.  Hurte Decl. ¶ 20.  The University instituted an Interim Chalking Policy "to be in effect during finals, winter break, and the start of the Spring term, until a permanent policy could be implemented" through ISU's robust policy review process.  Rippke Decl. ¶ 20.

      Policy development at ISU is guided by the Policy Library Advisory Committee ("PLAC"), an advisory group comprised of administrators and students who meet periodically to consider new policies and amendments to existing policies.  *Id*. ¶¶ 6-7.  The proponents of a new policy or an amendment to existing policy complete a Policy Development Plan ("PDP") setting forth detailed information, including the purpose and scope of the policy change and the administrators whose approval will be required for adoption.  *Id*. ¶ 9 & Ex. A.  PLAC considers the PDP and offers guidance on potential clarifications and improvements to the proposal.  If PLAC determines a public comment period is advisable, the proposed policy is posted online with instructions on how to submit comments.  Rippke Decl. ¶¶ 13-14.  When the comment period closes, the proposed policy is revised to account for feedback as appropriate.  *Id*. ¶ 15.  The final version is circulated to senior ISU administrators for approval and signature, and then the policy is posted online and takes effect.  *Id*. ¶¶ 16-17.

To formulate ISU's policy on chalking, a PDP was drafted on November 11, 2019, and discussed at PLAC meetings on December 17, 2019 and January 28, 2020. *Id.* ¶ 21. Following the second meeting, the proposed policy was sent to the student government and posted online for comment. *Id.* ¶¶ 22-24. After the policy was amended to account for comments, it was presented to senior ISU officials. *Id.* ¶ 25. With their unanimous approval, the new policy took effect on February 17, 2020. *Id.* ¶¶ 25-26. It replaces the interim policy, which ISU has no intention of restoring, and "reflects the considered judgment of University administrators." *Id.* ¶ 27. The operative policy restricts chalking in a limited number of places on campus with "enormous historical significance and importance to the ISU community and its alumni." Hurte Decl. ¶ 21. The restricted areas include the historic quad space—one of only three university central campuses designated as a "medallion site" by the American Society of Landscape Architects. *Id.* ¶ 21(a). Chalking is also restricted inside a memorial plaza, a sculpture garden, and a handful of other clearly marked locations. *Id.* ¶ 21(b)-(e).

## C.   Acceptable Use Of University Email

At its January 28, 2020 meeting, PLAC also considered an amendment to Section 4.5 of the University's Acceptable Use of Information Technology Resources policy. Rippke Decl. ¶ 28. That Section previously contained a prohibition on "sending emails to solicit support for a candidate or ballot measure." Lohrbach Decl. ¶ 4. But that prohibition was never enforced against any students, *id.* ¶ 5, and Plaintiff does not allege to the contrary. Michael Lorhbach, ISU's Director of Enterprise Services and Success, has been at the University for over twenty years and oversees its email system; he is not aware of ISU ever receiving a complaint about a student sending such an email or being prevented from sending such an email. *Id.* ¶¶ 1, 4-5. Indeed,

because ISU does not monitor student emails for content, enforcement of the provision would be impossible.  *Id.* ¶ 6.

Mr. Lohrbach therefore worked with PLAC to conform Section 4.5 to "the reality of the University's non-enforcement."  *Id.* ¶ 7.  The amendment clarified that the restriction applies only to *employees* of the University, who are barred by state law from using public resources for political purposes.  *Id.* ¶ 9.  The amendment was posted for public comment, but no comments were received.  Rippke Decl. ¶ 29.  It was subsequently approved by senior ISU officials, and it went into effect on February 17, 2020.  *Id.* ¶ 31.  This amendment supplants the prior policy, which ISU has no intention of ever reinstating.  *Id.* ¶ 32; Lohrbach Decl. ¶ 12.  The policy now "reflects what [ISU's] actual practice has always been."  Lohrbach Decl. ¶ 12.  This policy does not prevent Plaintiff's members, or any ISU student, from sending emails supporting and/or opposing any candidate or issue.  *Id.* ¶ 13.

### D. Campus Climate Reporting System

The University's Campus Climate Reporting System ("CCRS") helps ISU's administration understand the needs and concerns of its more than 32,000 students.  Stewart Decl. ¶ 6.  An ISU student survey conducted in 2017 revealed "that various groups, spanning the ideological and political spectrum, felt there were inadequate means of bringing matters of concern to the University."  *Id.* ¶ 5.  That revelation troubled administrators, since young adults "facing a problematic situation without support" could resort "to escalation and violence," "shut[]" themselves off from life on campus," or "drop[] out of ISU entirely."  *Id.*  The survey also identified gaps in information-sharing between staff and administrators.  *Id.* ¶ 6.  ISU responded by creating a Campus Climate Reporting Team ("CCRT").  *Id.* ¶ 8.  But, because ISU's primary objective "was to expedite communication and enhance awareness and dialogue about campus

climate issues—not to investigate them," ISU replaced CCRT in October 2019 with CCRS.  *Id.* ¶¶ 8-9.

Through CCRS, members of the campus community can make ISU staff and administrators aware of incidents on campus that cause them concern—from property damage, to inadequate snow removal, to illicit alcohol in residence halls, to allegations of harassment or incidents believed to be motivated by bias.  *Id.* ¶ 21.[1]  Most common are reports of vandalism, comprising nearly half of the incidents reported in recent years.  *Id.* ¶ 22.  Reports are submitted to CCRS online, *id.* ¶ 12, and most reports "do not name any student associated with the incident."  *Id.* ¶ 15. Upon receiving a report, Jazzmine Brooks, CCRS's administrator, captures a screenshot of the report that she circulates to CCRS members.  *Id.* ¶¶ 3, 13.  Those members include representatives from various University offices including the Office of Equal Opportunity, the Office of Diversity and Inclusion, the Dean of Students Office, the Department of Residence, ISU DPS, the Provost, University Counsel, the Office of University Relations, and University Human Resources.  *Id.* ¶ 13.  Many incidents "require no follow up whatsoever, and once Ms. Brooks sends the email, the CCRS process for an incident is complete."  *Id.* ¶ 14.

CCRS itself only acts further if a reporting student provides identifying information and asks to be contacted.  *Id.* ¶ 15.  In such circumstances, "Ms. Brooks will send a follow up email to the student, confirm that the report was received and, when appropriate, offer the student a list of resources that are available to them, such as counseling."  *Id.*  Ms. Brooks never reaches out to a student whose behavior is described in a report, even if the student is identified.  *Id.* ¶ 16.  Indeed, the University's policy and practice of not reaching out to a student whose behavior was reported

---

[1] Although an important University resource, CCRS reports are relatively infrequent—in 2018, CCRT received 94 total reports; in 2019, CCRT/CCRS received 96 total reports; and from January 1 through February 6, 2020, CCRS received 25 reports.  Stewart Decl. ¶ 20.

to CCRS was "a deliberate choice" when the University replaced CCRT with CCRS. *Id*. ¶ 9. Thus, contrary to Plaintiff's allegations, CCRS does not impose "burdensome administrative processes (including meetings with University administrators)," or "meet[] with individual(s) identified as committing the bias to discuss impact and institutional values." *Id*. ¶ 16 (quoting Am. Compl. ¶¶ 61, 109). Plaintiff is also wrong that students contacted by CCRS "must comply with the official's directive" or else they will be found in "contempt." *Id*. ¶ 17 (quoting Pl.'s Mot. at 8). CCRS does not contact students unless they request it (and then only contacts the reporting student), and all contact between CCRS and students is entirely voluntary. *Id*. ¶ 15. "CCRS cannot and does not force students to meet with it, and cannot and does not impose any sanction whatsoever." *Id*. ¶ 17.

Plaintiff is also wrong to claim that other offices on campus might contact students about reports of bias incidents, investigate the circumstances of such reports, or subject reported students to discipline. The Office of Student Conduct ("OSC"), responsible for enforcing the Student Code, does not "receive CCRS reports, either directly or through a referral from any other office or person on campus." Kellogg Decl. ¶ 4. As the University official in charge of OSC explained, "there is no connection between CCRS and OSC and no 'report' from CCRS would ever lead to a 'referral' of a student to OSC." *Id*. ¶ 6. Moreover, OSC lacks authority to respond to bias incidents in any event given that such incidents do not violate the Student Code. *Id*. ¶¶ 5, 10-11; Hurte Decl. ¶¶ 16-17.

Nor do the offices represented on CCRS respond to reports of bias incidents with any form of punishment or sanction. For example, the Office of Equal Opportunity ("OEO") does not perform "outreach to a student as a result of that student's conduct being reported through CCRS." Foreman Decl. ¶ 13. That is because "a CCRS report alone cannot and does not begin an OEO

investigation, let alone result in any kind of discipline or sanction against any student." *Id*. ¶ 12. "OEO would only contact a student whose conduct is reported once a formal OEO complaint regarding an incident has been filed and OEO determines the complaint details conduct within its authority that could constitute a violation of the Student Code." *Id*. ¶ 13. Similarly, unless a CCRS report involves potential criminal conduct, ISU DPS does not respond. Newton Decl. ¶¶ 15-16.[2] The same is true of Residence Life: expressing the views that Plaintiff's members allegedly wish to express does not violate any ISU housing policy, so "no student engaging in this type of speech has, or would, face any adverse consequences from the University generally or the Residence Life Department in particular." Speight Decl. ¶ 17.

One example highlighted in the Complaint illustrates how badly Plaintiff mischaracterizes CCRS's operations. The Complaint describes a report about "student government discussing a bill allowing student organizations to limit membership based on 'the group's beliefs and standards,' which was interpreted as 'discrimination against the LGBT community.'" Am. Compl. ¶ 56. The report quoted statements made by Mr. Schrader, the bill's author. Schrader Decl. ¶ 7. Mr. Schrader "was not aware that a CCRS report was made about [his] support of the bill until [he] read about it in Plaintiff's Complaint and Motion," because no one from ISU ever contacted him about the report, much less "subjected [him] to any administrative process" or referred him for discipline. *Id*. ¶¶ 8-9. "There was no pressure from the University whatsoever" to curb his advocacy of the bill. *Id*. ¶ 8. Mr. Schrader's speech was not chilled by CCRS, a system he himself has used "to report incidents that caused concern to [him] on campus." *Id*. ¶ 10. He explained:

---

[2] ISU DPS has received reports about protected expression, such as a student running through a residence hall yelling a racial slur and posters advocating for students to carry firearms on campus. Newton Decl. ¶ 10(a), (c). In such circumstances, the responding officer advised "the reporting student that the reported student has a First Amendment right to continue to make his or her statements and that ISU DPS has no role to play." *Id*. ¶ 10.

"As a politically conservative student who actually was the subject of a CCRS report, I can say that Plaintiff's characterization of the consequences of a CCRS report does not reflect the reality of my experience." *Id.* ¶ 9.

## ARGUMENT

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted); *see also Stowers v. Donahoe*, No. 4:11-CV-112, 2011 WL 13308322, at *2 (S.D. Iowa June 21, 2011). This remedy is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation marks omitted); *see also Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019). The moving party bears a heavy burden, particularly where it seeks substantially the same relief it would obtain after a trial on the merits. *Gomez v. Allbee*, 134 F. Supp. 3d 1159, 1173-74 (S.D. Iowa 2015); *see also Scott v. Benson*, 863 F. Supp. 2d 836, 842 (N.D. Iowa 2012).

The moving party must prove a preliminary injunction is required in light of four factors, each of which must be considered: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation marks omitted).

## I.      Plaintiff Is Unlikely To Prevail On The Merits.

### A.      Plaintiff's Claims Challenging Eliminated Policies Are Moot.

"Under Article III of the Constitution,  federal courts 'may adjudicate only actual, ongoing cases or controversies.'"  *McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1035 (8th Cir. 2004) (quoting *Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 689 (8th Cir. 2003) (internal quotation marks omitted)).  Courts lack "authority to give opinions  upon moot questions … or to declare principles  or rules of law which cannot affect the matter in issue in the case before it." *Doe v. Nixon*, 716 F.3d 1041,  1051 (8th Cir. 2013) (quotation  marks omitted).  Accordingly, a case is dismissed as moot "when changed circumstances [have] already provide[d]  the requested relief and eliminate[d]  the need for court action."  *Moore v. Thurston*, 928 F.3d 753, 757 (8th Cir. 2019) (alterations in original) (quotation marks omitted).  When a challenged provision  is amended or repealed, "actions  seeking  declaratory or injunctive  relief for earlier versions [of the provision] are generally moot."  *Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013) (quoting *Phelps–Roper v. City of Manchester*, 697 F.3d 678, 687 (8th Cir. 2012) (en banc)).

Two of Plaintiff's  three claims are moot under this governing  law.  While Plaintiff challenges  ISU's interim  chalking  policy  for imposing  "content-based  and speaker-based restrictions on protected speech in a traditional  public forum," Am. Compl. ¶¶ 22-27, that interim policy  was replaced with a new and final policy  containing  no such restrictions, Rippke Decl. ¶¶ 19-27 & Ex. B.  Similarly,  while Plaintiff challenges a provision  in the email use policy for imposing  "content- and viewpoint-based  restrictions on protected speech," Am. Compl. ¶¶ 35-37, that provision  has been eliminated  as to students—the only group Plaintiff claims to represent, Rippke Decl. ¶¶ 28-32 & Ex. C.  This Court "can neither declare unconstitutional  nor enjoin the enforcement of a provision  that is no longer in effect."  *Stevenson v. Blytheville Sch. Dist. #5*, 800

F.3d 955, 964-65 (8th Cir. 2015) (citation omitted).   "An injunction prohibiting the defendant[] from enforcing the [policies] thus would have no meaning because the [policies] … cannot be enforced against [Speech First's members] or anyone else." *Turning Point USA at Ark. State Univ. v. Rhodes*, 409 F. Supp. 3d 677, 684 (E.D. Ark. 2019), *appeal docketed*, No. 19-3016 (8th Cir. Sept. 18, 2019).

Moreover, "there is no reasonable expectation that the wrong will be repeated," as a result of ISU reinstating the eliminated policies.   *Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 811 (8th Cir. 2007) (quotation marks omitted).   The University utilized its full and formal process to amend the policies, one of which was an "interim" policy to begin with, and neither of which ever resulted in any student punishment.   *See supra* at 7-9.   Moreover, the amendments went through public notice and comment, and were approved by senior leaders including ISU's President.   *See* Rippke Decl. ¶¶ 19-32 & Exs. A-D.   There is simply "no indication" ISU will revert to the prior policies; indeed declarants have attested to the contrary.   *See Libertarian Party of Ark. v. Martin*, 876 F.3d 948, 951 (8th Cir. 2017).

Other courts have dismissed as moot challenges to eliminated university policies.   In *Beta Upsilon Chi Upsilon Chapter at the University of Florida v. Machen*, 586 F.3d 908 (11th Cir. 2009), a university initially refused official recognition to a Christian fraternity but during litigation amended the student handbook and granted recognition.   *Id.* at 913-15.   Finding the fraternity's appeal moot, the court observed, "[i]n cases where government policies have been challenged, the Supreme Court has held almost uniformly that voluntary cessation of the challenged behavior moots the claim." *Id.* at 917.   Because a controversy is live "only when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated," the court examined the record for evidence of potential reinstatement and found none.   *Id.* (quotation

marks omitted).  The court relied in particular on an affidavit of a university official who described the decision to modify the handbook as a "considered" one that would be applied going forward. *Id*.  The grounds for mootness are even stronger here.  *See supra* at 7-9.  Likewise, in a similar lawsuit brought by Speech First, the University of Illinois removed a challenged policy from its Student Code after suit was filed, "following the formal procedures for doing so."  Order at 25, *Speech First v. Killeen*, No. 3:19-CV-3142 (C.D. Ill. Sept. 17, 2019), ECF No. 23 ("Killeen Order"), *appeal docketed*, No. 19-2807 (7th Cir. Sept. 19, 2019).  Finding mootness, the court explained that while it was "theoretically possible that the University could reverse course," "there is no evidence tending to show that such a theoretical possibility is even remotely likely, especially given the history of non-enforcement of the requirement."  *Id*. at 27.  The same is true here.[3]

B.   **Plaintiff's Challenges To CCRS Are Not Likely To Succeed.**

i.   **Plaintiff does not have standing to challenge CCRS.**

Under the doctrine of associational standing, Speech First has standing only if its members do.  *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986).  Standing has three essential elements: (1) injury-in-fact, (2) sufficient causal connection between the injury and the challenged conduct, and (3) the likelihood that the injury will be redressed by a favorable decision.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014).  These elements must be established for each claim the plaintiff advances.

---

[3] The Sixth Circuit's divided panel opinion in *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019), is not to the contrary.  In holding an eliminated provision not moot, the court found four facts critical:  (1) Michigan actively applied the challenged definitions before Speech First filed suit; (2) Michigan continued to defend its use of those definitions during the suit; (3) Michigan did not follow any formal process to abandon the definitions and did not produce any evidence of a formal process it would need to follow if it wanted to reinstate them; and (4) Michigan did not affirm that it did not intend to reinstate the abandoned definitions.  *Id*. at 769-70.  The situation here is exactly the *opposite* as to each factor.  *See supra* at 7-9.

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).   Moreover, the plaintiff's burden to demonstrate standing in the context of a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion," *Lujan v. Nat'l Wildlife Fed'n (Lujan I)*, 497 U.S. 871, 907 n.8 (1990), and therefore requires "specific facts" rather than "mere allegations," *Lujan v. Defs. of Wildlife (Lujan II)*, 504 U.S. 555, 561 (1992).

The injury-in-fact requirement demands an injury that is real and immediate.  *Iowa Right To Life Comm., Inc. v. Tooker*, 717 F.3d 576, 584 (8th Cir. 2013).  In the absence of an pending enforcement action, a plaintiff bringing a First Amendment challenge must either show: (a) he intends to engage in conduct at least arguably affected with a constitutional interest but also proscribed by the challenged policy, and he faces a credible threat the policy will be enforced, *Susan B. Anthony List*, 573 U.S. at 158-59 (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); or (b) there is a chilling effect on his expression that is objectively reasonable, *Laird v. Tatum*, 408 U.S. 1, 11, 13-14 (1972).  "Either way, a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1292 (2019).

Plaintiff cannot demonstrate a credible threat of enforcement here.  CCRS is a campus reporting system; it does not proscribe any form of expression, let alone protected speech. *See supra* at 9-12.  A credible threat of enforcement does not exist where the desired "course of conduct … is not proscribed" by the provision or program under challenge. *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 793-93 (8th Cir. 2004).  Simply put, "there is nothing" about CCRS that prevents Plaintiff's members from expressing their views on

"controversial" topics, and indeed the substantial evidence ISU has introduced shows how commonly those views are expressed in practice. *Id*. at 293. The notion that ISU would subject Plaintiff's members to adverse action based on their expression, even if reported to CCRS, "is unpersuasive and, at best, amounts to evidence of a conjectural or hypothetical injury" that is insufficient to establish standing. *Iowa Right To Life Comm., Inc.*, 717 F.3d at 587 (quotation marks omitted).

Plaintiff has not alleged that any of its members have been reported to CCRS, nor has it cited a *single* instance of a University student facing investigation, discipline, or any other burden for engaging in protected speech. Indeed, Mr. Schrader's declaration shows this is simply not the case. *See supra* at 12-13. Students routinely express the same viewpoints that Plaintiff describes as "chilled" without any repercussions. *See supra* at 4-7. Plaintiff's members do not face "a realistic danger of sustaining a direct injury as a result of" CCRS's operation, and so they cannot demonstrate the First Amendment injury necessary for standing. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

For much the same reason, Plaintiff cannot demonstrate that its members' alleged self-censorship is objectively reasonable. The vast majority of Plaintiff's unverified and anonymous allegations about First Amendment chill are based on CCRT, not CCRS. *See* Pl.'s Mot. at 4-8 (repeatedly citing to Ex. 23, the CCRT Annual Report for 2018, and Ex. 15, an article from 2018 describing CCRT). While Plaintiff blithely asserts that "CCRS is indistinguishable from its predecessor," that assertion comes solely from the fact that CCRS's website still uses the word "team" to refer to its members. Pl.'s Mot. at 4 (citing Ex. 11). In reality, the University's transition from CCRT to CCRS involved meaningful changes in its operations. Thus, for example, "CCRS does not reach out to the student whose behavior is reported," "a deliberate choice" ISU made.

Stewart Decl. ¶¶ 9, 16.  Accordingly, Plaintiff's allegations that CCRS imposes "burdensome administrative processes," Am. Compl. ¶ 109, and "meets with individual(s) identified as committing the bias to discuss impact and institutional values," *id*. ¶ 61, are simply untrue.  "A student who allegedly committed a bias incident would not be contacted by CCRS at all."  Stewart Decl. ¶ 17.

Even if Plaintiff's allegations about student meetings with CCRS were true, which they are not, those allegations do not create standing.  An invitation to a voluntary, non-disciplinary meeting fails to implicate the First Amendment at all.  *Laird*, 408 U.S. at 11.  *Abbott*, in which a student was required to meet with university officials after he coordinated a "Free Speech Event," is directly on point.  900 F.3d at 163.  The purpose of the meeting was to determine whether allegations that the event involved sexist and racist statements warranted an investigation.  *Id*.  The Fourth Circuit found the meeting did not chill protected speech:

> Even an objectively reasonable "threat" that the plaintiffs might someday have to meet briefly with a University official in a non-adversarial format, to provide their own version of events in response to student complaints, cannot be characterized as the equivalent of a credible threat of "enforcement" or as the kind of "extraordinarily intrusive" process that might make self-censorship an objectively reasonable response.

*Id*. at 179.  That reasoning applies with full force here.  Indeed, if a *mandatory* meeting with university officials to explore whether a full-blown investigation is necessary does not support standing, any invitation by the University for a voluntary meeting (to the extent that even occurred before CCRT transitioned to CCRS) falls far short of demonstrating injury-in-fact.  It is thus no surprise Speech First has been found to lack standing in two of its three prior cases, including its challenge to the University of Texas at Austin's Campus Climate Response Team that Plaintiff claims ISU has largely copied "word-for-word," Am. Compl. ¶ 40.  *See Speech First v. Fenves*,

384 F. Supp. 3d 732 (W.D. Tex. 2019), *appeal docketed*, No. 19-50529 (5th Cir. June 7, 2019); Killeen Order.

*Laird* is likewise instructive.  In *Laird*, the plaintiffs alleged a First Amendment chill arising from a system through which the Army gathered and disseminated information about civilian disturbances within the United States, but took no punitive actions based upon the reported information.  Rejecting very similar arguments to those of Plaintiff here, *Laird* explained that First Amendment standing cannot be based on a "chilling effect aris[ing] merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some other and additional action detrimental to that individual."  408 U.S. at 11.  To the contrary, a plaintiff suffers an injury-in-fact only when "the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging." *Id*.  As in *Laird*, Plaintiff has not even alleged, let alone proved, that CCRS takes any compulsory or proscriptive actions.

Seeming to recognize that CCRS has no authority or ability to punish students expressing the views Plaintiff's members allegedly wish to express, Plaintiff next claims the "CCRS apparatus objectively chills speech by threatening students with negative consequences (including referrals to the University's disciplinarians)."  Am. Compl. ¶ 109; *see also* Pl.'s Mot. at 2 ("Students accused of a bias incidents risk referral to University officials for investigation and discipline.").  This allegation provides no basis for standing.  Bias incidents are not proscribed by any University policy or any state or federal law, nor does CCRS subject any reported student to any investigation or discipline.  *See* Kellogg Decl. ¶¶ 10-11; Stewart Decl. ¶¶ 9, 11; Newton Decl. ¶¶ 7-8; Foreman

Decl. ¶¶ 10, 12-13.  Plaintiff does not even allege that anyone has ever been punished for engaging in the type of speech its members allegedly wish to express.  Under *Laird*, CCRS's function as a centralized reporting mechanism does not provide a basis for standing.  Indeed, if this were not the case, *any* information-sharing mechanism—from an anonymous complaint box to a suicide hotline to a student newspaper—could provide the basis for First Amendment standing based merely on an allegation that it gathers information about potential bias incidents that could later be conveyed to disciplinarians.  That is not the law.

Moreover, Plaintiff cannot dispute that if a CCRS report describes biased speech accompanied by a violation of law or the Student Code—for example a violent assault accompanied by racial epithets—ISU has an *obligation* to investigate the incident and impose discipline if warranted.  Yet, as the record evidence demonstrates, only in these situations—namely when there is an alleged violation of law or the Student Code—could the "University's disciplinarians" take action.  And, even then, only when an official OSC or criminal charge has been issued through formal processes.  *See supra* at 11-12.  Plaintiff might resort to arguing that CCRS could use the threat of referral to require reported students to meet with a member of CCRS.  *See Schlissel*, 939 F.3d at 765.  But any such argument should be dismissed out of hand: Plaintiff has introduced no factual evidence—nor even an allegation—that ISU administrators would threaten a referral for which there was no legal basis in order to coerce a meeting with a student that, in any event, CCRS never seeks.  *See supra* at 10-12.

In sum, Plaintiff's "referral" theory rests on the notion that CCRS could "at some future date misuse the information [it receives] in some way that would cause direct harm" to Plaintiff's members.  *Laird*, 408 U.S. at 13.  These are allegations of "subjective chill" that the Supreme Court has flatly rejected as a basis for standing.  *Id*. at 13-14.  Students of "ordinary firmness," *see*

*Gomez*, 134 F. Supp. 3d at 1175, are not deterred by CCRS from expressing exactly the views Plaintiff's members claim that want to express, *see supra* at 4-7, and thus Plaintiff lacks standing to brings these claims.

### ii.   Plaintiff would not prevail on the merits even if it had standing.

Even setting standing aside, Plaintiff's overbreadth and vagueness challenges to CCRS's definition of "bias incidents" fail. *See* Pl.'s Mot. at 12-14. Plaintiff never claims that the definition applies to anything other than CCRS—the definition comes directly from the CCRS website and does not appear anywhere in the Student Code. *See* Stewart Decl. Ex. A. But, as Plaintiff's own cases make clear, in order to be overbroad or vague, a regulation must place a "burden on protected expression," *Meese v. Keene*, 481 U.S. 465, 480 (1987)—that is, it must proscribe or punish speech.[4] CCRS has no investigative or disciplinary function, does not meet with reported students, and has *never* imposed discipline for a reported bias incident. *See supra* at 10-12. Plaintiff's claim that "First Amendment freedoms are at stake" arising from CCRS's definition of bias incidents is simply false. *See* Pl.'s Mot. at 14.

## II.   Additional Factors Weigh Against A Preliminary Injunction.

As the Eighth Circuit has noted, "the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019) (quotation marks omitted). Plaintiff also fails to meet its burden with respect to the remaining three factors.

*First*, "[t]o succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for

---

[4] *See* Pl.'s Mot. at 12-14 (citing, *inter alia*, *Gooding v. Wilson*, 405 U.S. 518 (1972) (definition of "fighting words" criminalized by Georgia statute); *United States v. Stevens*, 559 U.S. 460 (2010) (definition of "depiction of animal cruelty" criminalized by federal law)).

equitable relief.'" *Scott*, 863 F. Supp. 2d at 844 (quotation marks omitted).  Plaintiff falls back on the presumption that any deprivation of a First Amendment right constitutes irreparable harm. Pl.'s Mot. at 14-15.  But Plaintiff has not shown it likely that ISU violated, or in the future will violate, First Amendment rights, so irreparable harm cannot be presumed.  "Speculative harm does not support a preliminary injunction," *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012), yet that is all Plaintiff offers here.[5]

*Second*, Plaintiff cannot show that the balancing of harms favors extraordinary relief.  This Court must consider "whether the defendant has already voluntarily taken remedial action," that renders injunctive relief "wholly unnecessary." *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 479 F. Supp. 2d 968, 993 (N.D. Iowa 2007).  That is the case here, since the University has already eliminated the chalking and email policies that Plaintiff seeks to enjoin.  Pl.'s Mot. at 1.  As for CCRS, "an illusory harm to the movant will not outweigh any actual harm to the non-movant." *Ideal Instruments, Inc.*, 479 F. Supp. 2d at 993.  The University does not "us[e] the CCRS (or any of its University partners) to investigate, threaten, refer, or punish students (including informal punishments) for bias incidents."  Pl.'s Mot. at 16; *see supra* at 10-12.  Accordingly, the purported harm to Plaintiff is illusory.

In contrast, to the extent Plaintiff seeks to enjoin CCRS's operations altogether, such relief would cause substantial injury to the University and its community.  Universities have substantial interests in "being allowed to manage their affairs and shape their destiny free of minute

---

[5] The University does not defend the eliminated policies on chalking and email use.  But even if this Court finds Plaintiff's claims not moot, "a preliminary injunction does not follow as a matter of course. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018) (quotation marks and citations omitted).  This Court must also consider irreparable harm, *id.*, and Plaintiff cannot meet its burden as to eliminated policies because "there is no showing of any real or immediate threat that the plaintiff will be wronged again." *City of L.A. v. Lyons*, 461 U.S. 95, 111 (1983).

supervision by federal judges and juries," and in "maintain[ing] an atmosphere conducive to learning." *Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 467 (7th Cir. 2007); *see also Am. Future Sys., Inc. v. Pa. State Univ.*, 752 F.2d 854, 865 (3d Cir. 1984) ("[A] public university has a significant interest in carrying out its educational mission, and that this interest necessarily gives it some power to regulate its students' lives"). If this Court were to enjoin CCRS's operations, the University's mission will suffer. CCRS ensures that the University understands and serves the needs of its large community. CCRS connects students with important resources in times of need while cultivating an environment in which students of all political and social perspectives thrive because they feel safe and supported.

*Third*, Speech First's request for relief does not serve the public interest. "The Supreme Court has articulated that it is generally not in the public interest for courts to second-guess the academic decisions of a college or university." *Gomez*, 134 F. Supp. 3d at 1182 (citing *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)). Because Plaintiff has not shown it likely that the University took action to chill the First Amendment rights of Plaintiff's members, "the public interest does not tip in favor of granting the injunction." *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiff's motion should be denied.

Dated: February 25, 2020                    Respectfully submitted:


By:     /s/ Ishan K. Bhabha

Ishan K. Bhabha (*pro hac vice*)
Lauren J. Hartz (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001

Telephone:  (202) 639-6000
Facsimile:  (202) 639-6066
ibhabha@jenner.com
lhartz@jenner.com

Matthew D. Callanan
BELIN McCORMICK, P.C.
666 Walnut Street, Suite 2000
Des Moines,  IA 50309-3989
Telephone:  (515) 283-4610
Facsimile:  (515) 558-0610
mdcallanan@belinmccormick.com

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2020, I filed the foregoing with the Clerk of Court

using the ECF system which will send notification of such filing to the following:

Skylar J. Limkemann, AT0012324
SMITH MILLS SCHROCK BLADES PC
118 3rd Ave. SE, Suite 200
P.O. Box 36
Cedar Rapids, IA 52406-0036
(319) 286-1743
SLimkemann@smithmillslaw.com

Thomas R. McCarthy (*pro hac vice*)
Cameron T. Norris (*pro hac vice*)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com

/s/ Ishan K. Bhabha
Ishan K. Bhabha